UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| CARL BURNIE WELLBORN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:05-cv-346 |
| | ) | |
| v. | ) | Honorable Robert J. Jonker |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  After a jury trial, Petitioner was convicted of one count of first-degree criminal sexual

conduct (CSC), MICH. COMP. LAWS § 750.520b(1)(b), and two counts of second-degree CSC, MICH.

COMP. LAWS § 750.520c(1)(a) and (b), in the Kent County Circuit Court.  On May 13, 2002, the

Kent County Circuit Court sentenced Petitioner to ten to thirty years' imprisonment for the first-

degree CSC conviction and ten to fifteen years' imprisonment for each of the second-degree CSC

convictions.  In his *pro se* petition, Petitioner raises the following grounds for habeas corpus relief:

> I.   WHETHER PETITIONER WAS DENIED HIS RIGHT TO THE
> EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL
> FOREWENT THE OPPORTUNITY TO INTRODUCE EVIDENCE OF A
> COMPLAINANT'S PRIOR FALSE ALLEGATIONS OF SEXUAL ABUSE
> WHICH RESULTED IN THE PETITIONER'S ACQUITTAL, AND
> WHERE COUNSEL AGREED THAT THE ACQUITTAL WAS
> INADMISSIBLE?

> A.   WAS PETITIONER'S ACQUITTAL OF THE COMPLAINANT'S
> ALLEGATIONS IN THE MONTCALM COUNTY CASE
> ADMISSIBLE AS EVIDENCE OF PRIOR FALSE ALLEGATIONS
> OF SEXUAL ABUSE, IN CONJUNCTION WITH THE SIXTH

AMENDMENT CONFRONTATION CLAUSE AND THE
FOURTEENTH DUE PROCESS CLAUSE RIGHT TO PRESENT
A COMPLETE DEFENSE.

B.     WAS PETITIONER'S TRIAL COUNSEL'S CONCESSION THAT
THE PRIOR ACQUITTAL WAS NOT ADMISSIBLE, A
DEPRIVATION OF PETITIONER'S SIXTH AMENDMENT
RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN
CONJUNCTION WITH THE SIXTH AMENDMENT
CONFRONTATION CLAUSE AND FOURTEENTH
AMENDMENT DUE PROCESS CLAUSE RIGHT TO PRESENT
A COMPLETE DEFENSE.

II.     WHETHER PETITIONER WAS DENIED HIS CONSTITUTIONAL
RIGHT TO A JURY DRAWN FROM A VENIRE REPRESENTATIVE OF
A FAIR CROSS-SECTION OF THE COMMUNITY WHERE KENT
COUNTY HAS PUBLICLY ACKNOWLEDGED THAT DUE TO A
COMPUTER ERROR, NEARLY SEVENTY-FIVE PERCENT OF THE
COUNTY'S ELIGIBLE JURORS WERE BEING EXCLUDED IN SUCH
A WAY AS TO UNDER-REPRESENT AFRICAN-AMERICANS AND
OTHER MINORITIES?

(Pet'r's Br. in Supp. of Pet., vi, docket #2.)  Respondent filed an answer to the petition (docket #12)

stating that Petitioner's grounds for habeas relief should be denied because they are without merit

or procedurally defaulted.  Upon review and applying the Antiterrorism and Effective Death Penalty

Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standards, I find that Petitioner's grounds for

habeas corpus relief are without merit or procedurally defaulted.  Accordingly, I recommend that

the petition be denied.

**Procedural History**

A.     **Trial Court Proceedings**

The state prosecution arose from Petitioner's alleged sexual relationship with two

young step-granddaughters, Alicia Faunce and Clorissa Rolfe, while Petitioner lived in Kent County.

Petitioner was charged with two counts of first-degree CSC for sexual penetration with Alicia

- 2 -

Faunce and two counts of second-degree CSC, one count for sexual contact with Alicia Faunce and

one count for sexual contact with Clorissa Rolfe.[1]  (Tr. V, 99-105.)  On March 19, 21, 22, 25, 26 and

27,  2002, the Kent County Circuit Court tried Petitioner before a jury.

   Alicia Faunce, Petitioner's step-granddaughter, testified first for the prosecution.  (Tr.

II, 30, 33.)  At the time of her testimony, Alicia was sixteen years old and in tenth grade.  (Tr. II, 30-

31.)  Alicia's mother and step-father are Lisa and Todd Thompson.  (Tr. II, 32.)  Alicia testified that

Petitioner lived with her family on two separate occasions, in Virginia and in Michigan.  (Tr. II, 34-

35.)  Alicia was five years old when she lived in Virginia.  (Tr. II, 35.)  She stated that Petitioner

started doing "sexual things" to her in Virginia.  (Tr. II, 35.)  The first time Petitioner ejaculated on

Alicia in the middle of the night.  (Tr. II, 35-36.)  She did not tell anyone of that incident.  (Tr. II,

36.)

   Alicia later moved with her family to Michigan and eventually settled in Montcalm

County.  (Tr. II, 36-37.)  In 1998, Petitioner and Alicia's grandmother, moved in with Alicia's

family in Montcalm County.  (Tr. II, 38.)  As many as three or four times a week between May and

September 1998, Petitioner came into Alicia's bedroom at night, kissed her passionately with his

tongue, inserted his fingers in her vagina, and placed his penis in her mouth.  (Tr. II, 38-40, 87.)

Several times, Alicia tried to scream but Petitioner covered her mouth, laid on her or hit her so she

would be quiet.  (Tr. II, 40, 53-56.)  Petitioner also choked her.  (Tr. II, 56-57.)  Alicia did not tell

---

[1]Transcripts from the trial will be numbered I through VI as follows:
Transcript of March 19, 2002, vol. I, docket #17 (Tr. I);
Transcript of March 21, 2002, vol. II, docket #18 (Tr. II);
Transcript of March 22, 2002, vol. III, docket #19 (Tr. III);
Transcript of March 25, 2002, vol. IV, docket #20 (Tr. IV);
Transcript of March 26, 2002, vol. V, docket #28 (Tr. V); and
Transcript of March 27, 2002, vol. VI, docket #21 (Tr. VI).

anyone of the sexual contact because Petitioner threatened that he would harm her or her family. (Tr. II, 40-41, 56.)  Petitioner and Alicia's grandmother eventually moved to a house in Kent County.  (Tr. II, 41-42.)

Alicia visited her grandmother and Petitioner at their new residence in Kent County because she missed her grandmother.  (Tr. II, 42.)  She also spent the night at Petitioner's house. (Tr. II, 42.)  Alicia testified that Petitioner put his fingers in her vagina, his penis in her mouth, and his tongue in her vagina on several occasions.  (Tr. II, 42-44.)  Most of the sexual encounters occurred in the computer room of Petitioner's home. (Tr. II, 43.)  The first encounter Alicia remembered in the computer room was when Petitioner kissed her and put his fingers in her vagina. (Tr. II, 44.)  During those times, Alicia's grandmother was busy with the other children or she was not home.  (Tr. II, 43.)  Alicia tried to scream, but she could not.  (Tr. II, 43.)  She also tried to stop Petitioner.  (Tr. II, 44.)

Petitioner put his penis in Alicia's mouth.  (Tr. II, 44.)  Alicia testified, however, that Petitioner put his penis in her mouth at Alicia's house in Montcalm County rather than Petitioner's house in Kent County.  (Tr. II, 37, 42, 44.)  She was not sure if that happened at Petitioner's house. (Tr. II, 44.)  Alicia also played with Petitioner's penis with her hands until he was ready to ejaculate. (Tr. II, 45.)  Petitioner would then ejaculate in the bathroom.  (Tr. II, 45.)  In addition, Petitioner initiated phone sex with Alicia on two or three occasions.  (Tr. II, 80-81.)   Petitioner would ask Alicia what she was wearing and if she was going to come over so he could fool around with her. (Tr. II, 81.)

In 1998, Alicia told her mother that she did not feel comfortable around Petitioner but did not go into any details.  (Tr. II, 46-47, 81-83.)  Alicia did not tell her mother about

- 4 -

Petitioner's actions because she was scared. (Tr. II, 47.) Alicia, however, said that Petitioner threatened to hurt her and her family. (Tr, II, 83-84.) She did not want anything to happen to her or her family. (Tr. II, 47.) When her mother asked Alicia if she wanted to go to the police, Alicia answered "no." (Tr. II, 47, 84-85.) Alicia thought Petitioner would stop because he was moving out of their house. (Tr. II, 85.)

Before approaching her parents a second time, Alicia talked to her friend Renee about Petitioner's sexual advances. (Tr. II, 48-49.) Renee told Alicia that she would go to the police if Alicia did not do something. (Tr. II, 48.) Alicia finally disclosed everything to her parents. (Tr. II, 48-49.) Her parents then called the police. (Tr. II, 49.)

The police conducted investigations in Montcalm and Kent Counties. (Tr. II, 49.) In accordance with those investigations, Alicia received a physical exam. (Tr. II, 49-50.) The physical exam did not reveal any genital warts on Alicia but Alicia was aware that her cousin, Ann Marie Rolfe, had genital warts. (Tr. II, 59.) Alicia's mother mentioned that Ann Marie could have received the genital warts from Petitioner because he used to have genital warts. (Tr. II, 59-60, 65.) Alicia's mother and aunt, Deana Rolfe, confided in Alicia that Petitioner tried sexually assaulting them when they were younger. (Tr. II, 62-65, 161-62, 164.) Alicia's mother also told her that Petitioner raped some other girls in Virginia. (Tr. II, 65-66.) Alicia later learned that Petitioner did not rape anyone in Virginia. (Tr. II, 67-68.) Alicia did not ask her mother why she lied about the Virginia incident. (Tr. II, 68.)

After 1997, Alicia and her cousins developed a buddy system when they went to Petitioner's house because they felt uncomfortable. (Tr. II, 75.) However, the system did not work as the girls often became separated at Petitioner's house. (Tr. II, 75-76.)

Alicia spoke with her cousin, Ann Marie Rolfe, regarding the sexual abuse.  (Tr. II, 76-77.)  Alicia told Ann Marie that Petitioner had been touching her.  (Tr. II, 77.)  When Alicia asked Ann Marie where Petitioner touched her, Ann Marie pointed to her vagina.  (Tr. II, 77-78.)  Alicia talked to Ann Marie about the sexual abuse before the police interviewed her.  (Tr. II, 77-78.)  When Alicia approached another cousin, Clorissa Rolfe, about Petitioner, Clorissa refused to talk about it.  (Tr. II, 78-79.)  Clorissa just started to cry.  (Tr. II, 79.)

Clorissa Rolfe, Petitioner's step-granddaughter, testified that she was thirteen and in the seventh grade at the time of the trial.  (Tr. II, 92, 94, 120.)  Clorissa lived with Petitioner in Virginia for a few months when she was six years old.  (Tr. II, 95, 121-22.)  At that time, Petitioner would try to put his tongue in Clorissa's mouth and he flashed her.  (Tr. II, 97.)  Petitioner's sexual advances occurred no more than ten times in Virginia.  (Tr. II, 123.)

Clorissa's family eventually relocated to Michigan.  (Tr. II, 97.)  Petitioner also moved to Michigan but lived with the family of Clorissa's aunt, Lisa Thompson.  (Tr. II, 98.)  While Petitioner was living with Clorissa's aunt, he did not make any sexual advances toward Clorissa.  (Tr. II, 98.)  When he moved to Kent County, however, Petitioner would try to French kiss Clorissa, reach down her pants and touch her breasts.  (Tr. II, 96, 100-02.)  Petitioner only tried to reach down her pants once.  (Tr. II, 101-02.)  On that occasion, Clorissa told Petitioner no and grabbed his hand.  (Tr. II, 101.)  While Clorissa was in the computer room at Petitioner's house, Petitioner also tried to touch her breasts.  (Tr. II, 102.)  Clorissa estimated that Petitioner attempted to sexually assault her on less than ten occasions.  (Tr. II, 102.)  Clorissa never reported any of the sexual advances because she was afraid that no one would believe her.  (Tr. II, 102-03.)

Around 1998 or 1999, Clorissa's aunt and uncle asked Clorissa if Petitioner sexually assaulted her. (Tr. II, 103, 107-08.) Clorissa lied and replied no. (Tr. II, 104, 109, 111.) In 2000, Clorissa finally spoke up when she learned that Petitioner had been touching her younger sister, Ann Marie Rolfe. (Tr. II, 103, 122.) Clorissa's family then went to the police. (Tr. I, 104.) Clorissa also participated in a physical exam. (Tr. II, 105.)

Ann Marie Rolfe, Petitioner's step-granddaughter, testified that she was nine years old and in the third grade at the time of the trial. (Tr. II, 125-26, 131.) Ann Marie stated that Petitioner would touch her "private[s]" while in an upstairs room. (Tr. II, 135-38.) During her testimony, Ann Marie received assistance from a therapist because she has a speech impediment. (Tr. II, 138-39.) Petitioner would touch her underneath her clothes. (Tr. II, 140.)

Lisa Thompson, Petitioner's step-daughter, testified for the prosecution. (Tr. II, 149-50.) Ms. Thompson is Alicia Faunce's mother and Clorissa and Ann Marie Rolfe's aunt. (Tr. II, 150.) Petitioner lived with Ms. Thompson's family in Virginia for five to six months, (Tr. II, 151-52), and in Montcalm County, Michigan, for almost a year, (Tr. II, 153-54). At one point, Ms. Thompson's daughter, Alicia, came to her and stated that she did not want to spend so much time with Petitioner and she did not like sitting on his lap. (Tr. II, 155.) Ms. Thompson attributed the conversation to her daughter being a teenager. (Tr. II, 155.) At that time, Petitioner mentioned that Alicia was being rude and ignoring him. (Tr. II, 155-56, 176-77.) Afterward, Ms. Thompson noticed that Alicia was very distant with Petitioner. (Tr. II, 156.) Alicia started to keep to herself, and she experienced headaches and anxiety attacks. (Tr. II, 160.) Alicia also requested a lock to be put on her bedroom door but Petitioner "had a fit." (Tr. II, 156.)

After this case came out, Ms. Thompson talked with Alicia about Petitioner's sexual advances toward her when Ms. Thompson was sixteen years old. (Tr. II, 161-62.) Ms. Thompson also clarified that the alleged rape of a minor by Petitioner occurred in Michigan rather than Virginia. (Tr. II, 162.) Alicia must have overheard Ms. Thompson talking with her sister about the rape because Ms. Thompson did not discuss it with Alicia. (Tr. II, 162-63.)

After talking with a friend and counselor, Alicia approached her step-father, and then Ms. Thompson, to talk about Petitioner's actions. (Tr. II, 158-59.) Upon speaking with Alicia, Ms. Thompson called her sister, Deana Rolfe, at work because Clorissa was also involved. (Tr. II, 159.) Deana came to Ms. Thompson's house to discuss the allegations. (Tr. II, 159.) Ms. Thompson then called 911. (Tr. II, 159-60.)

On cross-examination, Ms. Thompson testified that she did not remember Alicia telling her that Petitioner threatened Alicia. (Tr. II, 168.) In 1998, Alicia only mentioned that she felt uncomfortable around Petitioner to Ms. Thompson. (Tr. II, 168-69.) Ms. Thompson also approached her niece, Clorissa Rolfe, to see if she had any problems with Petitioner. (Tr. II, 170-71.) Clorissa answered "[n]o, I don't want to talk about it." (Tr. II, 172.)

Dr. Vincent Palusci testified as an expert in pediatrics. (Tr. III, 3, 7-8.) On March 22, 2001, Dr. Palusci performed a genital exam and a medical evaluation of Alicia Faunce. (Tr. III, 10, 15.) Alicia had been referred to Dr. Palusci for a medical evaluation of digital and oral genital contact. (Tr. III, 11.) While Dr. Palusci found some redness, irritation and evidence of poor hygiene in Alicia's genital exam, he did not find any injuries, cuts, or bruises. (Tr. III, 13-15.) Dr. Palusci also obtained a laboratory specimen from Alicia's vagina. (Tr. III, 15.) The laboratory results did not reveal any sexually transmitted diseases. (Tr. III, 16.) Dr. Palusci then examined Clorissa Rolfe

for digital genital contact but did not find any injuries.  (Tr. III, 17, 19.)  He did not obtain a laboratory specimen from Clorissa because Clorissa recently underwent a pap smear.  (Tr. III, 19-20.)  Finally, Dr. Palusci examined Ann Marie Rolfe for digital genital contact on April 5, 2001.  (Tr. III, 20-22.)  He found genital warts near Ann Marie's urethra.  (Tr. III, 22.)  Genital warts can be sexually transmitted.  (Tr. III, 22.)  For genital warts to be transmitted, the wart tissue has to be directly transferred to the infected area by contact.  (Tr. III, 32, 47.)  However, Dr. Palusci did not know the source of the contact.  (Tr. III, 32-33.)  No one mentioned that Petitioner had a history of genital warts to Dr. Palusci.  (Tr. III, 34-36.)  Dr. Palusci referred Alicia, Clorissa and Ann Marie to counseling.  (Tr. III, 17, 20, 23-24.)  Dr. Palusci testified that it is not typical to find scarring or substantial injuries from digital or oral genital contact especially when there has been a significant delay in time.  (Tr. III, 24, 47-48.)

Deana Rolfe, Petitioner's step-daughter, testified that Clorissa and Ann Marie Rolfe are her daughters.  (Tr. III, 48-49.)  Deana's family lived with Petitioner in Virginia.  (Tr. III, 50.)  When Deana's family returned to Michigan, she first lived with the family of her sister, Lisa Thompson.  (Tr. III, 51.)  Petitioner was not living at Ms. Thompson's house at that time.  (Tr. III, 51.)

In March 2001, Ms. Thompson called Deana at work to go home.  (Tr. III, 53-54.)  When she arrived home, Deana asked Clorissa if Petitioner ever touched her.  (Tr. III, 54-56.)  Clorissa became very upset and cried.  (Tr. III, 56.)  Soon after, Ms. Thompson came to Deana's home to discuss the allegations of sexual abuse by Petitioner.  (Tr. III, 56.)  They called the police.  (Tr. III, 56-57.)  Deana had noticed that Clorissa would not go to Petitioner's house alone.  (Tr. III, 57-58.)  She also found Clorissa to be depressed, quiet and complained of stomach problems.  (Tr.

III, 58.)  Deana  testified that she never told Alicia Faunce that Petitioner sexually assaulted her in

Virginia.  (Tr. III, 67-68.)

Renee Sattler testified that she played volleyball with Alicia Faunce at Central

Montcalm High School.  (Tr. III, 95-96.)  Around January, she talked with Alicia on instant

messenger.  (Tr. III, 98, 106.)  Alicia stated that Petitioner sexually assaulted her.  (Tr. III, 102.)

Upon receiving that information, Ms. Sattler told Alicia that she had to speak with her parents.  (Tr.

III, 103.) Ms. Sattler gave Alicia one week to talk with her parents.  (Tr. III, 103.)  When Alicia did

not approach her parents within one week, Ms. Sattler met with the school counselor, and the police

were eventually called.  (Tr. III, 103-04.)  Alicia also gave Ms. Sattler a handwritten letter (Tr. III,

108), but requested it back to give to Child Protective Services  (Tr. III, 109-10).   The letter

mentioned all of the instances that Petitioner molested Alicia.  (Tr. III, 110-11.)  "It talked about him

masturbating in front of her, him going inside of her, making her give him oral sex, him fondling

her, feeling her pretty much up."  (Tr. III, 111.)  The letter implied that Petitioner put his penis inside

her vagina on one occasion.  (Tr. III, 111-13.)

Detective Diane Kik testified that she works as a police officer in the Kent County

Sheriff's Department.  (Tr. III, 113-14.)  On March 8, Detective Kik met with Lisa Thompson and

Deana Rolfe, and then Alicia Faunce, and Clorissa and Ann Marie Rolfe.  (Tr. III, 115-16.)  During

Alicia's meeting, Alicia mentioned that she told Jena Emma first about the sexual abuse rather than

Renee Sattler.  (Tr. III, 123.)  Alicia also told Detective Kik that Petitioner previously molested a

girl and the girl's father burned down a house, but she did not indicate where that occurred.  (Tr. III,

120-22.)  Detective Kik also interviewed Ann Marie but she denied being touched at all by

- 10 -

Petitioner, including hugs and kisses.  (Tr. III, 129-30, 132, 147.)  Ann Marie's mother attended the interview because of Ann Marie's speech impediment.  (Tr. III, 117, 133.)

Tom Cottrell testified as the Program Director of the Child Sexual Abuse Treatment Program at the YWCA.  (Tr. IV, 3.)  The Child Sexual Abuse Treatment Program provides counseling to families of sexual abuse.  (Tr. IV, 4.)  He testified as an expert in the field of "exposure to sexual assault victims."  (Tr. IV, 7.)  Mr. Cottrell testified that eighty percent of the cases of sexual abuse in a family do not have immediate disclosure.  (Tr. IV, 10.)  The disclosure time can run from a matter of weeks to thirty or forty years.  (Tr. IV, 10.)  A sexual abuse victim may not want to disclose due to fear, loyalties to the offender, or loyalties to other family members. (Tr. IV, 10-11.)  Disclosure may occur when a victim finds that a sibling was also abused.  (Tr. IV, 15.)  Mr. Cottrell noted that if a child hears that someone raped another person or somebody has a sexually transmitted disease, the child may not necessarily make a false accusation. (Tr. IV, 28-29.) Any child who has been sexually abused is confused about what is happening to them.  (Tr. IV, 29.) At the conclusion of Mr. Cottrell's testimony, the prosecution rested.  (Tr. IV, 30.)

Petitioner testified in his defense.  (Tr. IV, 31.)  Petitioner is married to Lee Ann Wellborn and has two step-daughters, Lisa Thompson and Deana Rolfe, and three step-granddaughters, Alicia Faunce, Clorissa Rolfe and Ann Marie Rolfe.  (Tr. IV, 32-33.)  Petitioner denied sexually assaulting Lisa Thompson, Alicia Faunce, and Clorissa and Ann Marie Rolfe.  (Tr. IV, 35-37, 53.)  He also stated that he never raped a girl in Virginia or had his house burned down as a form of revenge.  (Tr. IV, 37, 40-41.)  Petitioner claims that the allegations of sexual assault are a result of Ms. Wellborn's ex-husband attempting to re-enter their lives after fifteen years.  (Tr. IV, 37-38.)  In 2000, Petitioner and his wife refused to spend the holidays with their daughters if their

biological father was present.  (Tr. IV, 38-39.)  This upset Ms. Thompson, who Petitioner described as a "control freak."  (Tr. IV, 38.)  Petitioner alleges that Ms. Thompson controls the family through threats, stealing and conning people.  (Tr. IV, 38, 61-62.)  Before Christmas 2000, Ms. Thompson and Deana Rolfe also approached Ms. Wellborn about leaving Petitioner because he allegedly abused Ms. Wellborn.  (Tr. IV, 39-40.)

Petitioner testified that he does not have genital warts.  (Tr. IV, 41.)  He also denied placing his elbow on Alicia's neck or throat to choke her so she would not scream.  (Tr. IV, 44.)  Petitioner never placed a hand on any of his step-granddaughters, even to discipline them.  (Tr. IV, 45-47.)  In 1998, Ms. Thompson and Deana Rolfe did not approach Petitioner to say that Alicia or Clorissa was uncomfortable around him.  (Tr. IV, 51-52.)  Petitioner stated that all of the allegations were a bunch of lies and everyone, the victims, the prosecutors, and the detectives, were trying to get him.  (Tr. IV, 59-60.)

During cross-examination, Petitioner testified that he won the criminal sexual conduct case brought against him in Montcalm County.  (Tr. IV, 60.)  Petitioner also stated that Alicia was the only step-granddaughter to testify in the Montcalm County case.  (Tr. IV, 60-61.)  At the Montcalm County hearing, Petitioner never mentioned any problems with Ms. Thompson.  (Tr. IV, 67-69.)

Lee Ann Wellborn, Petitioner's wife, testified for the defense.  (Tr. IV, 72-73.)  Ms. Wellborn stated that she never saw Petitioner discipline Alicia Faunce, Clorissa Rolfe or Ann Marie Rolfe.  (Tr. IV, 75.)  In November 2000, Ms. Wellborn called the police after an argument with Petitioner.  (Tr. IV, 76-79.)  Ms. Wellborn testified that Ms. Thompson requested that she call the

police.  (Tr. IV, 78.)  Ms. Thompson and Deana Rolfe were both upset when Ms. Wellborn would not leave Petitioner after the argument.  (Tr. IV, 80.)

Ms. Wellborn did not notice any bruises or scrapes on Alicia, Clorissa or Ann Marie when they spent the night at their house.  (Tr. IV, 81-82.)  She never heard any screams in the middle of the night or any cries for help from any of her granddaughters.  (Tr. IV, 81.)  Alicia, Clorissa and Ann Marie never indicated that they were scared of Petitioner.  (Tr. IV, 82.)  Ms. Wellborn also described her daughter, Ms. Thompson, as controlling.  (Tr. IV, 84.)

Ms. Wellborn met with Alicia and Clorissa at their school.  (Tr. IV, 86-88.)  Alicia mentioned to Ms. Wellborn that she heard Petitioner raped a girl in Virginia from her mother, Ms. Thompson, and Alicia did not want that to happen to her, Clorissa or Ann Marie.  (Tr. IV, 86-87.)  When Ms. Wellborn spoke with Clorissa at school, Clorissa screamed that she wanted it to end.  (Tr. IV, 88-89.)  At that time, school officials ended the conversation.  (Tr. IV, 89.)

Ms. Wellborn testified that she does not have genital warts.  (Tr. IV, 91.)  Ms. Wellborn also mentioned that she no longer has any contact with her daughters or granddaughters. (Tr. IV, 93.)

On rebuttal, the prosecutor called Alicia Faunce to the stand.  (Tr. IV, 95.)  Alicia testified about the incident at her high school with her grandmother, Lee Ann Wellborn.  (Tr. IV, 96.)  When Ms. Wellborn visited Alicia at school, she accused Alicia of fabricating the sexual abuse charges and called her a slut.  (Tr. IV, 96-97.)  Ms. Wellborn also pulled Clorissa from her class. (Tr. IV, 98.)  Clorissa started crying and saying that Ms. Wellborn could not tell her that it never happened.  (Tr. IV, 98.)  The school counselor eventually escorted Ms. Wellborn out of the building. (Tr. IV, 98-99.)

- 13 -

The prosecutor also called Clorissa Rolfe on rebuttal.  (Tr. IV, 104.)  Clorissa testified regarding the incident at her school.  (Tr. IV, 105.)  She talked to her grandmother and Alicia in the high school counseling office.  (Tr. IV, 105.)  Clorissa mentioned that her grandmother accused her of lying about the whole thing and called both Alicia and her, "little bitches."  (Tr. IV, 105, 107.)

Detective Diane Kik testified on rebuttal.  (Tr. IV, 111.)  Detective Kik interviewed Petitioner on May 27, 2001 and told him about the sexual abuse allegations.  (Tr. IV, 111-13.) Petitioner stated that Alicia and Clorissa were lying.  (Tr. IV, 113.)  Detective Kik asked Petitioner whether he touched the girls.  (Tr. IV, 114.)  Petitioner denied touching the girls but mentioned that he could have touched them by accident.  (Tr. IV, 114, 118.)  While Petitioner mentioned that Ms. Thompson was controlling and angry with him, he did not say anything about Ms. Thompson's or Deana Rolfe's biological father being involved.  (Tr. IV, 114-15.)  When asked why Alicia would make this up, Petitioner blamed the allegations on Ms. Thompson's controlling behavior.  (Tr. IV, 120.)

After deliberating, the jury returned a verdict of guilty of one count of first-degree CSC and two counts of second-degree CSC.[2]  (Tr. VI, 6.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief raised all of the issues in his application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #23.)  Petitioner filed a motion to remand on the issue of the jury venire, which was denied by the

---

[2]At the conclusion of the trial, the defense moved for a directed verdict on all charges.  (Tr. V, 3.)  The Kent County Circuit Court granted the motion as to one count of first-degree CSC of sexual penetration, to wit, penis in mouth with Alicia Faunce, because Alicia was not certain whether the sexual act occurred in Montcalm County or Kent County. (Tr. V, 5, 100, 110.)

Michigan Court of Appeals on March 13, 2003 because "the issue that defendant attempts to raise has been forfeited by the failure of defendant to raise it before the jury was sworn." (Mar. 13, 2003 Mich. Ct. App. Order, docket #23.)   Petitioner then filed a motion for reconsideration.   The Michigan Court of Appeals denied the motion on April 21, 2003.  (Apr. 21, 2003 Mich. Ct. App. Order, docket #23.)  By unpublished opinion dated December 16, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* Dec. 16, 2003 Mich. Ct. App. Op. (MCOA Op.), docket #23.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same claims rejected by the Michigan Court of Appeals.  By order entered June 30, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* June 30, 2004 Mich. Order, docket #24.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000). "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001). A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 405-07); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

- 16 -

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      **Ground I:  Confrontation and Due Process Clauses and Ineffective Assistance of Counsel**

Petitioner raised a compound claim in his first ground of habeas corpus relief based on the failure of the defense to introduce evidence in the Kent County trial of Petitioner's acquittal from a previous criminal sexual conduct trial in Montcalm County.  Petitioner presented the issue as a claim under the Confrontation and Due Process Clauses and as several claims of ineffective assistance of counsel.

Petitioner was previously tried before a jury in Montcalm County Circuit Court on allegations of sexual abuse by Alicia Faunce.  The Montcalm County jury acquitted Petitioner of all charges.  Prior to the current trial, the prosecutor moved *in limine* in Kent County Circuit Court to exclude evidence of Petitioner's acquittal from his previous trial in Montcalm County.  (Mar. 18, 2002 Pretrial Motions Transcript (Pretrial Mots. Tr.), 3-4; docket #16.)  Petitioner's trial counsel agreed to refrain from introducing the acquittal in the present trial but requested to use the Montcalm County trial transcripts for impeachment purposes.  (Pretrial Mots. Tr., 4.)  The trial court held that the attorneys could reference the trial transcripts for impeachment purposes so long as the attorneys

- 18 -

referred to the Montcalm County trial as "a hearing in Montcalm." (Pretrial Mots. Tr., 11-12; Tr. V, 19.)

### A.    Confrontation and Due Process Clauses

Petitioner argues that his prior acquittal in Montcalm County Circuit Court should have been admissible as evidence of false allegations of sexual abuse under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. (Pet'r's Br. in Supp. of Pet., vi, docket #2.) While Petitioner raised those claims in his direct appeal, the Michigan Court of Appeals failed to address whether the exclusion of evidence of Petitioner's acquittal violated the Confrontation Clause or the Due Process Clause. When the state court clearly did not address the merits of the claim, the district court will apply *de novo* review. *See McKenzie,* 326 F.3d at 727; *Wiggins,* 539 U.S. at 534; *Maples,* 340 F.3d at 437.

The Supreme Court has determined that criminal defendants have the right to a "meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984). The right is derived from the Confrontation Clause of the Sixth Amendment and from the Due Process Clause of the Fourteenth Amendment. *See Chambers v. Mississippi,* 410 U.S. 284, 302 (1973); *Washington v. Texas,* 388 U.S. 14, 19 (1967) ("[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process law."). The Supreme Court, however, repeatedly has recognized that the right to present a defense is subject to reasonable restrictions. *See United States v. Scheffer,* 523 U.S. 303, 308 (1998); *Taylor v. Illinois,* 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise

inadmissible under standard rules of evidence"); *Rock v. Arkansas,* 483 U.S. 44, 55 (1987); *Chambers,* 410 U.S. at 295; *see also Wong v. Money,* 142 F.3d 313, 325 (6th Cir. 1998). Indeed, "[a] defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interests in the criminal trial process." *Scheffer,* 523 U.S. at 308 (citations omitted) (internal quotations omitted).

      Even assuming Petitioner's rights were infringed under the Confrontation Clause or Due Process Clause by the exclusion of the acquittal testimony, the trial court's error was harmless. Confrontation Clause and Due Process Clause errors are subject to harmless-error analysis. *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 691 (1986); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Chapman v. California*, 386 U.S. 18, 21-22 (1967). On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (citing *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007)); *see also Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. If upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but very slight effect," the conviction must stand. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The alleged constitutional errors did not influence the jury or had a very slight effect on the jury because Petitioner still managed to introduce evidence of his acquittal during the Kent County trial, and the evidence overwhelmingly demonstrated that Petitioner was guilty.

During cross-examination by the prosecutor, Petitioner testified regarding his prior acquittal as follows:

Q      So the four of us are trying to get you?  Is there anybody else involved?
What   about Lisa's husband?

A      Lisa's husband does what he's told.

Q      He does what he's told?  So just the four – what about the prosecutor, you
       know, up in Montcalm?  She was – she was part of this conspiracy, too?

A      **I won that case.**

Q      But she's part of the conspiracy, correct?

A      **Obviously, she tried to – tried me and lost.**

Q      But that was a different case, right?

A      Same people.

Q      No.  Because you just said the other two girls weren't up there.  They didn't
       allege anything up in Montcalm –

A      You just said they weren't, that we talked about –

Q      Mr. – Mr. Wellborn, why don't you listen to my questions.  You just said
       yourself that Alicia was the only one up in Montcalm, correct?

A      Right.  That was charging me.

Q      The other two girls didn't testify up there, did they?

A      No, they didn't.

(Tr. IV, 60-61) (emphasis added.)  As a result, the evidence of Petitioner's acquittal was before the jury.

Moreover, Petitioner failed to show that any error was not harmless error, because the prosecution introduced overwhelming evidence of Petitioner's guilt.  Alicia Faunce, Clorissa

- 21 -

Rolfe and Ann Marie Rolfe testified regarding several instances of sexual assault by Petitioner in Kent County.  Alicia testified that Petitioner put his fingers in her vagina and his tongue in her vagina on several occasions.  (Tr. II, 42-44.)  Most of the sexual encounters occurred in the computer room of Petitioner's residence.  (Tr. II, 43.)  The first encounter Alicia remembered in the computer room was when Petitioner kissed her and put his fingers in her vagina.  (Tr. II, 44.)  At Petitioner's request, Alicia also used her hands to play with his penis.  (Tr. II, 45.)

Clorissa testified that Petitioner would try to French kiss her, reach down her pants and touch her breasts.  (Tr. II, 96, 100-02.)  Petitioner, however, only tried to reach down her pants once.  (Tr. II, 101-02.)  Clorissa told him no and stopped his hand.  (Tr. II, 101.)  While Clorissa was in the computer room, Petitioner would also try to touch her breasts.  (Tr. II, 102.)  Clorissa estimated that Petitioner attempted to sexually assault her on less than ten occasions.  (Tr. II, 102.)

Ann Marie testified that Petitioner would touch her "private[s]" while in an upstairs room.  (Tr. II, 135-38.)  Petitioner would touch her underneath her clothes.  (Tr. II, 140.)

Upon review of the entire record,  "without stripping the [allegedly] erroneous action from the whole," I find that any error by the trial court had, at best, only a "very slight effect" on the jury's determination of Petitioner's guilt or innocence in this case.  *O'Neal*, 513 U.S. at 437-38; *Kotteakos*, 328 U.S. at 764-65.  Therefore, Petitioner is not entitled to habeas relief on his constitutional claims under the Confrontation and Due Process Clauses.

B.    Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner also argues that his trial counsel violated his Sixth Amendment right to the effective assistance of counsel: (a) by failing to introduce evidence of Petitioner's acquittal from his Montcalm County trial; and (b) by conceding that the

prior acquittal was not admissible as evidence in violation of state law and of Petitioner's rights

under the Confrontation Clause and Due Process Clause. (Pet'r's Br. in Supp. of Pet., vi, docket #2.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court

established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To

establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's

performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.

A court considering a claim of ineffective assistance must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The

defendant bears the burden of overcoming the presumption that the challenged action might be

considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*

*Nagi v. United States,* 90 F.3d 130, 134-35 (6th Cir. 1996) (holding that counsel's strategic decisions

were hard to attack). The court must determine whether, in light of the circumstances as they existed

at the time of counsel's actions, "the identified acts or omissions were outside the wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error

had no effect on the judgment. *Id.* at 691. The defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. *Id.* at 694.

A claim of ineffective assistance of counsel presents a mixed question of law and

fact. Accordingly, the Court must apply the unreasonable application prong of § 2254(d)(1). Under

the "unreasonable application" standard, the state court identifies the correct governing legal rule

from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003); *Williams,* 529 U.S. at 412-13; *Barnes v. Elo,* 339 F.3d 496, 501 (6th Cir. 2003).

## 1.    **State Law Claims**

Petitioner asserts that his trial counsel violated his Sixth Amendment right to the effective assistance of counsel for failing to introduce evidence of his prior acquittal at trial and conceding that the prior acquittal was not admissible as evidence.  Petitioner claims that the evidence would have shown prior false allegations of sexual abuse by Alicia Faunce, and, thus, was admissible under state law.  The Michigan Court of Appeals addressed those evidentiary issues as follows:

> [Petitioner] first argues that he was deprived of his constitutional right to the effective assistance of counsel because trial counsel agreed with the prosecutor to exclude evidence of [Petitioner]'s acquittal in a Montcalm County case involving similar charges brought by one of the complainants in this case.  Because [Petitioner] failed to move for a new trial or an evidentiary hearing regarding his ineffective assistance claim, this Court's review is limited to mistakes apparent on the record. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).  We find no merit to [Petitioner]'s argument.

> To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors, there was a reasonable probability that the result of the proceeding would have been different. *Strickland v Washington*, 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984), on remand 737 F2d 894 (CA 11, 1984); *People v. Kevorkian*, 248 Mich App 373, 411; 639 NW2d 291 (2001).

> No ineffective assistance is apparent from the record.  Trial counsel's representation did not fall below an objective standard of reasonableness because his concession on the inadmissibility of the acquittal was consistent with the law.  In *People v Bolden*, 98 Mich App 452; 296 NW2d 613 (1980), the defendant argued that the trial court erred in precluding the jury from knowing that he was acquitted of the charges that comprised the prior similar acts evidence. Relying on *People v Oliphant*, 399 Mich 472; 250 NW2d 443 (1976), the *Bolden* Court held that the trial court did not err in excluding evidence of the acquittal, reasoning as follows:

We find this reasoning [that of *Oliphant* ] equally applicable to our consideration. The prosecutor must produce evidence sufficient to show that defendant "probably committed the other acts", *People v Cook*, 95 Mich App 645; 291 NW2d 152 (1980). If he or she can satisfy that burden, the jury should not be confused by the additional information of an acquittal which could mislead them into believing that the defendant absolutely did not commit the prior similar acts. The fact that another jury harbored a reasonable doubt as to defendant's guilt of the other offense does not negate the substantive value of the testimony to establish identity, scheme, plan, etc. in the case at bar. The issue should not be clouded by encouraging speculation regarding the verdict reached in a separate trial on a separate offense involving a different complainant. Defendant's rights were sufficiently protected by the trial court's limiting instructions concerning the purpose of similar acts testimony. [*Bolden, supra* at 461.] [FN1]

Moreover, while instructing the jury, the trial court said that it would not have admitted evidence of [Petitioner]'s acquittal even if the parties had not agreed to exclude it because the evidence was irrelevant. The trial court explained that there is no meaningful comparison between the two trials because there [we]re different juries, different prosecutors, and different accusations. [FN2] Because counsel is not required to advocate a meritless position, *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000), trial counsel's decision to forego mentioning the acquittal did not amount to objectively unreasonable assistance, let alone unreasonable assistance affecting the jury's verdict. We find no merit to [Petitioner]'s ineffective assistance of counsel claim.

FN1. Although a subsequent panel of this Court "expressed its support" for Judge Allen's partial dissent in *Bolden* on this issue, see *People v Nabers*, 103 Mich App 354, 364; 303 NW2d 205, *rev'd on other grounds*, 411 Mich 1046 (1981), that statement was dicta since it does not appear that either party raised as an issue in that case the admissibility of an acquittal. Furthermore, as was noted in *US v Gricco*, 277 F3d 339, 352-353 (CA 3, 2002), at least ten of the federal circuits (including the Sixth Circuit) have held that, except for purposes of determining whether the prosecution of a [Petitioner] is barred by double jeopardy or collateral estoppel, "evidence of prior acquittals is generally inadmissible." *Id.* at 352. That is so because judgments of acquittal "may not present a determination of innocence, but rather only a decision that the prosecution has not met its burden of proof beyond a reasonable doubt." *Id.*

FN2. The trial court instructed the jury in this manner because, during cross-examination, [Petitioner] testified that the victim had previously "tried me and lost."

- 25 -

(MCOA Op. at 1-2, docket #23.)

The Michigan Court of Appeals' conclusion was not an unreasonable application of *Strickland*. Before trial, the prosecutor moved *in limine* to exclude evidence of Petitioner's previous acquittal in Montcalm County Circuit Court. (Pretrial Mots. Tr., 3-4.) Petitioner's trial counsel agreed to exclude evidence of the acquittal as long as he could use certain testimony from the Montcalm County trial to impeach testimony in the present Kent County trial. (Pretrial Mots. Tr., 4.) The appellate court held that trial counsel's concession regarding the inadmissibility of Petitioner's acquittal was consistent with Michigan law; and, thus, counsel's representation did not fall below an objective standard of reasonableness. Counsel was not required to advocate a meritless position. (MCOA Op. at 1-2.) The state court's determination of admissibility of evidence under state law is not reviewable by this Court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Defense counsel cannot be deemed deficient for failing to make a futile motion to admit evidence of Petitioner's acquittal. *See United States v. Sanders*, 404 F.3d 980, 986 (6th Cir. 2005) (counsel cannot be ineffective for failing to object to what was properly done); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000) (failure by counsel to do something that would have been futile is not ineffective assistance); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Petitioner therefore failed to satisfy the performance prong of the *Strickland* standard regarding his claim of ineffective assistance of counsel based on state evidentiary law.

2.    **Constitutional Law Claims**

Petitioner also argues that his trial counsel was ineffective under the Sixth Amendment for failing to introduce evidence of Petitioner's prior acquittal as evidence of prior false allegations of sexual abuse in violation of the Confrontation and the Due Process Clauses.  (Pet'r's Br. in Supp. of Pet. at 28; docket #2.)  The Michigan Court of Appeals failed to address whether the exclusion of the acquittal evidence by trial counsel violated Petitioner's Sixth Amendment right to the effective assistance of counsel.  As stated above, the district court must apply *de novo* review. *See McKenzie,* 326 F.3d at 727; *Wiggins,* 539 U.S. at 534; *Maples*, 340 F.3d at 437.

The Court need not address whether counsel was deficient for failing to seek admission of the acquittal evidence under the Confrontation Clause or the Due Process Clause. When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.  Even if counsel's performance was found to be constitutionally deficient, Petitioner cannot demonstrate the necessary prejudice under the second *Strickland* prong.  *See id.* at 694.  Petitioner must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different to show that Petitioner had been prejudiced by counsel's deficient performance.  *Strickland*, 466 U.S. at 694.  Reasonable probability is defined as a probability "sufficient to undermine confidence in the outcome."  *Id.*

As stated in Section (I)(A), the alleged error by Petitioner's trial counsel did not prejudice Petitioner because he still managed to introduce evidence of his Montcalm County acquittal during the Kent County trial, and the evidence nevertheless overwhelmingly showed that Petitioner was guilty.  Petitioner therefore fails to demonstrate a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  Accordingly, Petitioner is not entitled to habeas corpus relief on his claim that counsel was constitutionally ineffective for failing to introduce of Petitioner's acquittal in Montcalm County under the Confrontation and the Due Process Clauses.

## II.     Jury Venire

In his second habeas claim, Petitioner contends that he was denied his constitutional right to a jury drawn from a fair cross-section of the community.  The Sixth Amendment guarantees a criminal defendant an impartial jury drawn from a fair cross-section of the community.  *Duren v. Missouri*, 439 U.S. 357, 358-59 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975).  The petit jury does not have to mirror the community, but distinct groups cannot be systematically excluded from the venire.  *See, United States v. Jackman,* 46 F.3d 1240, 1244 (2nd Cir., 1995).

Notwithstanding this right, the rule in Michigan has for some time been that a defendant can be precluded from raising the issue on appeal if he does not timely raise it at trial.  In *People v. Carter*, 462 Mich. 206 (2000), the Michigan Supreme Court stated that a defendant cannot waive an objection to an issue at trial and then make a claim of error on appeal.  In that instance, the court found that because the defendant's counsel had expressed satisfaction with the trial court's jury instructions, the defendant had waived the issue.  *Id.*

To establish a *prima facie* violation of the fair cross-section requirement, Petitioner bore the burden of proving "that a distinctive group was under-represented in his venire or jury pool, and that the under-representation was the result of systematic exclusion of the group from the jury selection process." *People v. Smith,* 463 Mich. 199 (2000), citing *Duren v. Missouri, supra.*

Petitioner, a Caucasian, argues that systematic errors in the Kent County Jury Management System caused a disproportionately low number of jury notices to be sent to residences in zip codes with proportionally larger African-American and other minority populations. (Pet'r's Br. in Supp. of Pet. at 36, 42-43.)  Relying mainly on newspaper articles, Petitioner argues in part that:

> In a story that first appeared in the July 30, 2002, Grand Rapids Press, Kent County officials conceded that their own review of their computer system revealed that "nearly seventy-five percent of the County's 454,000 eligible residents were excluded from potential jury pools since spring 2001", and that "[m]any blacks were excluded from the . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." The chief judge of the Kent County Circuit Court, George Buth, was quoted as saying, "There has been a mistake - a big mistake."  The article states that trouble-shooters detected the error in mid-July of 2002, and that the error had gone undetected for sixteen months. (Appendix E, page 1 of 4 of article of July 30, 2002 attached).

(Pet'r's Br. in Supp. of Pet. at 38.).

In Petitioner's case, jury selection occurred on March 19, 2002.  (Pet'r's Br. in Supp. of Pet. at 36.)  This would have been within the period during which the computer error purportedly occurred in the Kent County Jury Management System.  Petitioner, however, did not challenge the jury array at trial.  If he felt the jury venire looked too much like him, he did not say so.  At the close of jury voir dire, Petitioner's counsel stated: "Your Honor, the defense is satisfied with the panel." (Tr. I, 169.)  The jury was then empaneled and sworn.   There were no objections regarding the

composition of the jury array at any time during the trial, much less the voir dire, and trial counsel's statement constitutes an express waiver of the issue.

Although this Court cannot discern the race of the individual members of the jury array from the trial record, because Petitioner did not preserve the issue, Petitioner now contends that "[o]ut of approximately 70 potential jurors available to serve that day, I saw only 2 African-Americans present.  There were no African-American jurors or alternates on my jury."  (App. J. to Pet'r's Br. in Supp. of Pet.; docket #2.)   Petitioner's statement indicates he was well aware of the composition of the jury venire when he chose to accept the jury.

The Michigan Court of Appeals determined that Petitioner waived his challenge to the venire and jury selection process because his trial counsel expressed satisfaction with the jury's composition.  (MCOA Op. at 2.)  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  A procedural default is "a critical failure to comply with state procedural law."  *Trest v. Cain,* 522 U.S. 87, 89 (1997).  It will bar consideration of the merits of a federal claim if the state rule is actually enforced and is an adequate and independent ground for the state court's decision.  *Coleman v. Thompson,*  501 U.S. 722, 750 (1991); *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir., 2002).

To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an

"independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

      A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  To be timely under Michigan law, a challenge to the jury array must be made before the jury has been impaneled and sworn.  It is clear that this rule was well-established at the time of Petitioner's trial. *See People v. McCrea*, 6 N.W.2d 489, 514 (Mich. 1942); *People v. Hubbard*, 552 N.W.2d 493, 497-8, 498 (Mich Ct. App. 1996) ("A challenge to the jury array is timely if it is made before the jury has been empaneled and sworn. . . an expression of satisfaction with a jury made at the close of voir dire examination waives a party's ability to challenge the composition of the jury thereafter empaneled and sworn."); *People v. Stephen*, 188 N.W.2d 105, 106 (Mich. Ct. App. 1971).

      It is too late to raise the issue for the first time on appeal. *Id*.  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  The trial court cannot address issues not brought to its attention.  Contemporaneous objections allow the court to address the problem while something can be done to correct it.  A person would not watch his home being built on a cement block foundation, only to demand upon completion of the house that poured concrete be used instead.

Furthermore, failing to address perceived problems when they can be corrected, is simply an attempt to get a second bite at the apple. A defendant should not be afforded the opportunity to sit quietly and obtain a verdict under one set of rules when he knows there is a problem, only to demand a new trial with different rules if he is found guilty. If there is a problem during trial, it is incumbent upon the party, if he is aware of that problem or would be with due diligence, to bring it to the court's attention.

Petitioner failed to meet his burden of proof with regard to systematic exclusion of jurors, and his belated attempt to offer inadmissible hearsay evidence in the form of newspaper articles does not change that fact.[3]   Petitioner's failure to raise the issue in the trial court also left the appellate courts in this case with a record devoid of any competent evidence to consider in support of Petitioner's allegations. Consequently, the appellate courts had no means of conducting a meaningful review of his allegations on appeal. *See, People v. McKinney,* 258 Mich. App. 157, 161-2 (2003). Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., making an objection to the jury array before the jury has been impaneled and sworn, caused Petitioner to default his claim in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536-37 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-

---

[3]Michigan appellate courts may not take judicial notice of newspaper articles as they constitute inadmissible hearsay. *See, Baker v. General Motors Corp.,* 420 Mich. 463 (1984).

52.   The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 537. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Petitioner has made no such claim or showing of actual innocence in this case.

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  For cause, Petitioner argues that the factual basis for his claim was not reasonably available to counsel at the time of trial.

But, of course, it was.  Simply seeing an array when the deficiency is apparent provides adequate notice.  In light of Petitioner's purported all-white jury, and  70-person venire panel with only two African-Americans, of which Petitioner has admitted he was well aware, Petitioner and his counsel were placed on notice of the basis of his claim as soon as they viewed the jury array.

In *Hubbard, supra* at 498, the court pointed out the significance of viewing the array, holding that the defendant was not required to challenge the juror allocation process "before defendant actually viewed the array."  Once the defendant viewed the array he raised his objection.  The difference between *Hubbard* and the present case is that the defendant in *Hubbard* made his challenge after viewing the array and *prior* to the jury being sworn, and Petitioner did not.

In *People v. Oliphant,* 399 Mich. 472, 501 (1976), the defendant waited until the first day of trial to challenge the jury array, alleging that it deprived him of his right to an impartial jury drawn from a fair cross section of the community because of the absence of persons between the ages of 18 and 21. The Michigan Supreme Court held the challenge to be untimely because the claim was based "on the fact that no persons between the ages of 18 and 21 *appeared on the array*." (emphasis added).

In *People v. Bryant,* ___ Mich.. App. ___, 2004 WL 513644 (3/16/04), a defendant was convicted in Kent County during the same period as plaintiff but *did* make a timely objection during the voir dire process that he had been deprived of his Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community.  As a result of his timely objection, he was determined to have preserved his claim and was afforded an evidentiary hearing by the Michigan Court of Appeals.

Thus, the law in Michigan is unequivocal that you are considered on notice once you have viewed the array and you must raise a timely objection before the jury is empaneled and sworn.

Petitioner has adopted an alternative line of reasoning, arguing that the error was not procedurally defaulted because he could not have known the legal basis for his challenge to the jury venire earlier, since the purported computer glitch had not been discovered.  In support of his position, Petitioner relies on *Amadeo v. Zant,* 486 U.S. 214 (1988).  This was a death penalty case in which the district attorney and the jury commissioners in Putnam County, Georgia, intentionally engineered a scheme to cause African-Americans to be under-represented in the county's juries.  The scheme included a cover-up to mask the impropriety by keeping the percentage of black jurors within statistical guidelines mentioned in prevailing case law.  *See, Amadeo v. Kemp,* 816 F. Supp.

1502, 1508 (11th Cir., 1987) (dissent).[4]  The Supreme Court held that the district court's factual finding that the defendant's lawyers had not deliberately bypassed the jury challenge, because the deceit of the prosecutor and the jury commissioners had been intentionally hidden, was not clearly erroneous.

While this argument has found some traction with two other habeas cases arising out of Kent County during this period and currently pending in the Eastern District of Michigan,[5] the argument fails to distinguish between having notice of a defect in the jury venire, and knowing the underlying reason for the discrepancy.

The Michigan Court of Appeals has addressed Petitioner's argument that the reason for the purported discrepancy in the venire panel could not have been known to some defendants at the time of their trials, but has been careful to make the distinction between the opportunity defendants had to notice the fact of a discrepancy and raise the issue, and not knowing the reason why it occurred.  In *People v. Barnes,* No. 244590, 2004 WL 1121901 at *3 (Mich. App. Jan. 15, 2004) (unpublished), the court observed:

> We recognize that perhaps the alleged unconstitutional jury selection *process* could not have been specifically identified at the time of trial.  *But, in light of the all-white jury, it was incumbent on defendant to make a timely challenge or raise an objection.  A concern on defendant's part about the ratio makeup of the venire should have arisen, and a timely challenge may very well have led to discovery of possible problems in the selection process. . . . [B]ecause one of the elements is under-representation in a specific defendant's jury array or venire, defendant, when faced with an all-white jury, could have, minimally, raised an objection below.*  (emphasis added).

---

[4]*Amadeo v. Kemp* was the court of appeals decision in the *Amadeo v. Zant* case.

[5]*Parks v. Warren,* 2008 WL 3050051, at *5-8 (E.D. Mich. July 31, 2008); *Powell v. Howes,* 2007 WL 1266398, at *4-5 (E.D. Mich. May 1, 2007).  These cases are not binding authority on this Court, and I do not find their analysis of *Amadeo,* 486 U.S. 214, to be persuasive for the reasons stated above.

In the *Amadeo* case, unlike the present case and the situation in *Barnes,* simply viewing the array would not have alerted Amadeo to the discrepancy, since the representation of blacks on the venire was approximately 50%.[6]  *Amadeo v. Kemp,* 816 F.2d 1503, 1506.  This was because "the discriminatory scheme was designed to make detection by defendants nearly impossible.  The jury pool appeared to be fairly integrated."  *Id.* at 1509, 1511.  Since Amadeo had no meaningful opportunity to object at voir dire, the Supreme Court in this capital case focused on whether he should have discovered, by the time of the voir dire, the "smoking gun" (or incriminating memo) which had been concealed by county officials.  *Amadeo v. Zant, supra* at 223-4.  Thus, *Amadeo v. Zant* provides no guidance in the present case,[7] nor are the Michigan cases contrary to the *Amadeo* holding.

Where it is apparent upon viewing the array that it does not represent a fair cross-section of the community, it is, of course, not necessary to know the reason why in order to object.  Rather, it is by raising the question that a court has the opportunity to inquire and determine if there has been a constitutional violation.  For a court to ignore the requirement of a timely objection is simply to give a Petitioner (and presumably countless other unhappy defendants convicted during this same period) a second bite at the apple, because of the possibility of a constitutional violation that could have been investigated at the time and was not.[8]

---

[6]The actual jury in the *Amadeo* case contained an even number of blacks and whites as well.  *Id.*

[7]There is no allegation of active concealment in this case by the Kent County officials.  Even Petitioner contends only that a computer glitch in the Kent County Jury Management System caused the exclusion of minorities in the jury pool.  (Pet'r's Br. in Supp. of Pet. at 38.)

[8]While it may not be determinative of this issue, the possibility of going back and redetermining the actual racial makeup of the jurors summoned during this period is probably not feasible.  For example, the Kent County Circuit Court summoned 17,578 jurors in 2002, nearly 17% of which did not appear.  2002 Annual Report of the 17th Judicial Circuit Court at 18-19.  This court is not aware of any attempt by the circuit court at that time to systematically collect or maintain the race of each juror summoned, whether they appeared or not.  At best, the court would probably be left with statistical conjecture.  This simply reinforces the importance of the state rule on timely objections.

Petitioner has failed to demonstrate cause for his procedural default.  As a result, this claim is procedurally barred on habeas review, as it must be.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  September 16, 2008                    /s/ Hugh W. Brenneman, Jr.
                                              HUGH W. BRENNEMAN, JR.
                                              United States Magistrate Judge


### <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within eleven (11) days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).