UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL BURNIE WELLBORN,

                    Petitioner,              Case No. 1:05-cv-346

v.                                     Honorable Robert J. Jonker

MARY BERGHUIS,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a former state prisoner pursuant to 28 U.S.C. § 2254.[1]  The petition was denied, petitioner successfully appealed, and the matter is now before the Court on remand from the Sixth Circuit Court of Appeals. The sole issue under review is whether petitioner has demonstrated actual prejudice to excuse the procedural default of his second habeas claim.

### I.      Background

Petitioner, Carl Burnie Wellborn, is married to Lee Ann Wellborn ("Mrs. Wellborn"). He is the step-father to Mrs. Wellborn's two daughters, Lisa and Deana.  He is also the step-grandfather to Lisa's daughter AF, and Deana's daughters CR and AR.  Mrs. Wellborn is the biological mother of Lisa and Deana, and the biological grandmother of AF, CR and AR.  Mrs. Wellborn's ex-husband, Mr. Faunce, is the biological father of Lisa and Deana, and the biological grandfather of AF, CR and AR.

---

[1] Michigan Department of Corrections records reflect that petitioner was discharged on September 3, 2016.  *See* http://mdocweb.state.mi.us/OTIS2/otis2.aspx  reference Carl Burnie Wellborn No. 407313.

Petitioner was charged with two counts of first-degree criminal sexual conduct (CSC), M.C.L. § 750.520b(1)(b), and two counts of second-degree CSC, M.C.L. § 750.520c(1)(a) and (b). The victims were his step-granddaughters, AF and CR.  After a trial in the Kent County Circuit Court, the jury returned a verdict of guilty on Count I (first-degree CSC involving AF), Count II (second-degree CSC involving AF), and Count III (second-degree CSC involving CR).  Trial Trans. V at 99-105, 109-111 (docket no. 28); Trial Trans. VI at 6 (docket no. 21); Verdict Form (docket no. 80); *People v. Wellborn*, No. 242229, 2003 WL 22961704 at *1 (Mich. App. Dec. 16, 2013).[2]  The Kent County Circuit Court sentenced petitioner to 10 to 30 years imprisonment for the first-degree CSC conviction and 10 to 15 years imprisonment for each of the second-degree CSC convictions. Sent. Trans. at 13 (docket no. 22).  The Michigan Court of Appeals affirmed petitioner's convictions and the Michigan Supreme Court denied his application for leave to appeal.  *People v. Wellborn*, 2003 WL 22961704 at *1-3; *People v. Carl Burnie Wellborn III*, 470 Mich. 886 (June 30, 2004).

On May 16, 2005, petitioner filed the present federal habeas action seeking relief on the following grounds:

    I.    Whether petitioner was denied his right to the effective assistance of counsel where counsel forewent the opportunity to introduce evidence of a complainant's prior false allegations of sexual abuse which resulted in the petitioner's acquittal, and where counsel agreed that the acquittal was inadmissible?

        A.    Was petitioner's acquittal of the complainant's allegations in the Montcalm County case admissible as evidence of prior false allegations of sexual abuse, in conjunction with the Sixth Amendment

---

[2] At the conclusion of the trial, the defense moved for a directed verdict on all charges.  Trial Trans. V at 3.  The trial court granted the motion as to one count of first-degree CSC involving AF, because the victim was not certain whether the alleged sexual act occurred in Montcalm County or Kent County. *Id.* at 5.

confrontation clause and the Fourteenth [sic] Due Process Clause
right to present a complete defense.

B.    Was petitioner's trial counsel's concession that the prior acquittal was
not admissible, a deprivation of petitioner's Sixth Amendment right
to the effective assistance of counsel in conjunction with the Sixth
Amendment confrontation clause and Fourteenth Amendment due
process clause right to present a complete defense.

II.    Whether petitioner was denied his constitutional right to a jury drawn from
a venire representative of a fair cross-section of the community where Kent
County has publicly acknowledged that due to a computer error, nearly
seventy-five percent of the county's eligible jurors were being excluded in
such a way as to under-represent African-Americans and other minorities?

Report and Recommendation (R&R) at PageID.194-195 (Sept. 16, 2008) (docket no. 32).

In an R&R entered on September 16, 2008, the magistrate judge recommended that

the petition be denied.  *See* R&R (docket no. 32).  In reaching this determination, the magistrate

judge found that the ineffective assistance of trial counsel claims failed on the merits, and that the

jury venire claim was procedurally defaulted.  *Id.*  Shortly thereafter, the Sixth Circuit issued its

opinion in *Smith v. Berghuis,* 543 F.3d 326 (6th Cir. 2008), which held that Kent County's method

of selecting jurors violated the habeas petitioner's Sixth Amendment right to an impartial jury drawn

from a fair cross-section of the community.  Although the jury selection error in *Smith v. Berghuis*

did not involve the computer error at issue in this case, in an abundance of caution, the outstanding

R&R was dismissed as moot and the matter remanded for issuance of a new R&R, with instructions

to consider the impact of *Smith v. Berghuis* on petitioner's claims.  *See* Order (docket no. 36).

The second R&R addressed petitioner's jury venire claim in pertinent part as follows:

In his second habeas claim, Petitioner contends that he was denied his
constitutional right to a jury drawn from a fair cross-section of the community.  The
Sixth Amendment guarantees a criminal defendant an impartial jury drawn from a
fair cross-section of the community.  *Duren v. Missouri*, 439 U.S. 357, 358-59

(1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975). The petit jury does not have to mirror the community, but distinct groups cannot be systematically excluded from the venire. *See United States v. Jackman,* 46 F.3d 1240, 1244 (2nd Cir., 1995).

While acknowledging this right in its entirety, the rule in Michigan has for some time been that a defendant can be precluded from raising the issue on appeal if he does not timely raise it at trial. *See People v. McCrea,* 303 Mich. 213, 278 (1942). In *People v. Carter*, 462 Mich. 206 (2000), the Michigan Supreme Court stated that a defendant cannot waive an objection to an issue at trial and then make a claim of error on appeal. In that instance, the court found that because the defendant's counsel had expressed satisfaction with the trial court's jury instructions, the defendant had waived the issue. *Id.*

To establish a *prima facie* violation of the fair cross-section requirement, Petitioner bore the burden of proving "that a distinctive group was under-represented in his venire or jury pool, and that the under-representation was the result of systematic exclusion of the group from the jury selection process." *People v. Smith,* 463 Mich. 199 (2000), citing *Duren v. Missouri, supra.*

Petitioner, a Caucasian, argues that systematic errors in the Kent County Jury Management System caused a disproportionately low number of jury notices to be sent to residences in zip codes with proportionally larger African-American and other minority populations. (Pet'r's Br. in Supp. of Pet. at 36, 42-43.) Relying mainly on newspaper articles, Petitioner argues in part that:

> In a story that first appeared in the July 30, 2002, Grand Rapids Press, Kent County officials conceded that their own review of their computer system revealed that "nearly seventy-five percent of the County's 454,000 eligible residents were excluded from potential jury pools since spring 2001", and that "[m]any blacks were excluded from the . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." The chief judge of the Kent County Circuit Court, George Buth, was quoted as saying, "There has been a mistake - a big mistake." The article states that trouble-shooters detected the error in mid-July of 2002, and that the error had gone undetected for sixteen months. (Appendix E, page 1 of 4 of article of July 30, 2002 attached).

(Pet'r's Br. in Supp. of Pet. at 38.).

In Petitioner's case, jury selection occurred on March 19, 2002. (Pet'r's Br. in Supp. of Pet. at 36.) This would have been within the period during which the computer error purportedly occurred in the Kent County Jury Management System.

Petitioner, however, did not challenge the jury array at trial. If he felt the jury venire looked too much like him, he did not say so. At the close of jury voir dire, Petitioner's counsel stated: "Your Honor, the defense is satisfied with the panel." (Tr. I, 169.) The jury was then empaneled and sworn. There were no objections regarding the composition of the jury array at any time during the trial, much less during the voir dire, and trial counsel's statement constitutes an express waiver of the issue.

Although this Court cannot discern the race of the individual members of the jury array from the trial record, because Petitioner did not preserve the issue, Petitioner now contends that "[o]ut of approximately 70 potential jurors available to serve that day, I saw only 2 African-Americans present. There were no African-American jurors or alternates on my jury." (App. J. to Pet'r's Br. in Supp. of Pet.; docket #2.) Petitioner's statement indicates he was well aware of the composition of the jury venire when he chose to accept the jury.

The Michigan Court of Appeals determined that Petitioner waived his challenge to the venire and jury selection process because his trial counsel expressed satisfaction with the jury's composition. (MCOA Op. at 2.) When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). It will bar consideration of the merits of a federal claim if the state rule is actually enforced and is an adequate and independent ground for the state court's decision. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir., 2002).

To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). To be timely under Michigan law, a challenge to the jury array must be made before the jury has been impaneled and sworn. It is clear that this rule was well-established at the time of Petitioner's trial. *See People v. McCrea*,

- 5 -

6 N.W.2d 489, 514 (Mich. 1942); *People v. Hubbard*, 552 N.W.2d 493, 497-8, 498 (Mich Ct. App. 1996) ("A challenge to the jury array is timely if it is made before the jury has been empaneled and sworn. . . an expression of satisfaction with a jury made at the close of voir dire examination waives a party's ability to challenge the composition of the jury thereafter empaneled and sworn."); *People v. Stephen*, 188 N.W.2d 105, 106 (Mich. Ct. App. 1971).

*          *          *

.  .  .  Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., making an objection to the jury array before the jury has been impaneled and sworn, caused Petitioner to default his claim in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536-37 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 537. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner has made no such claim or showing of actual innocence in this case.

R&R at PageID.291-294, 295-296 (Feb. 29, 2009) (docket no. 38).

Based on the record in this case, the magistrate judge concluded that,

Petitioner has failed to demonstrate cause for his procedural default. As a result, this claim is procedurally barred on habeas review, as it must be.

*Id.* at PageID.300. Because petitioner did not demonstrate cause for the procedural default, it was unnecessary for the magistrate judge to address the prejudice prong.

Finally, the magistrate judge concluded that the decision in *Smith v. Berghuis* was easily distinguishable on the facts because the alleged systematic exclusion of African-Americans

in *Smith* did not involve the computer error at issue in the present case.  Rather, the jury selection process at issue in *Smith* involved practices which ended nearly ten years before petitioner's trial, i.e., assigning jurors to district court panels prior to assigning jurors to circuit court panels and excusing jury duty absences for social and economic reasons such as lack of transportation, child care and the inability to take time off of work.  *Id.* at PageID.300-301.[3]  Ultimately, the magistrate judge recommended that the petition be denied.  *Id.*  `The district judge adopted the recommended disposition, and this Court denied the petition, finding that the ineffective assistance of counsel claims raised in Issue I failed on the merits, and that the jury venire claim raised in Issue II was procedurally defaulted.   *See* Order (docket no. 45).  However, the Court issued a certificate of appealability "as to Petitioner's claim concerning his right under the Sixth Amendment to a jury drawn from a fair cross-section of the community."  *Id.* at PageID.345.

Petitioner appealed the decision to the Sixth Circuit, where his case was joined with two other cases which involved the same alleged computer problem in the jury selection, *Ambrose v. Booker*, 781 F. Supp.2d 532 (E.D. Mich. 2011) ("*Ambrose I*"), and *Carter v. Lafler*, 1:09-cv-215 (W.D. Mich. Jan. 8, 2010).  *See Ambrose v. Booker*, 684 F.3d 638 (6th Cir. 2012) ("*Ambrose II*"). However, the three cases reached different results, i.e., the habeas petition was granted in *Ambrose I* and denied in *Carter* and *Wellborn*.  The Sixth Circuit reversed and remanded all three cases in *Ambrose II*.

---

[3] The Court notes that the Supreme Court reversed and remanded the Sixth Circuit's decision in *Smith v. Berghuis*. *See Berghuis v. Smith*, 559 U.S. 314 (2010) (contrary to the Sixth Circuit's decision, the Michigan Supreme Court's decision on direct review, which rejected the petitioner's claim that his jury was not drawn from a fair cross section of the community, was consistent with the Supreme Court's decision in *Duren* and did not involve an unreasonable application of clearly established federal law).  On remand, this Court's 2006 judgment denying the petition was affirmed. *Smith v. Woods*, 505 Fed. Appx. 560 (6th Cir. 2012).

As an initial matter, the Sixth Circuit summarized petitioner's claim as follows:

These habeas petitions involve the far-reaching effects of an unintentional computer glitch that caused the systematic underrepresentation of African-Americans in the jury pools of Kent County, Michigan. The three petitioners received separate jury trials in Kent County in either 2001 or 2002. At jury selection, the petitioners did not object to the racial composition of their respective jury venires, and were subsequently convicted. A few months later, the Grand Rapids Press published a story detailing how Kent County's jury selection software had a computer glitch that had systematically excluded African-Americans from the jury pool. In light of these revelations, the petitioners each filed motions for post-conviction relief in state court. The state court found that the petitioners had waived these claims by failing to object to the racial composition of the jury venire during voir dire.

*        *        *

Carl Wellborn was convicted of sexually abusing his granddaughters by a Kent County Jury in March 2001. *Wellborn v. Berghuis*, No. 1:05-cv-346, 2009 WL 891708, at *8-14 (W.D.Mich. Mar. 31, 2009) (report and recommendation). On direct appeal, Wellborn claimed that he was denied a jury drawn from a fair cross-section of the community based on the Kent County computer glitch. The Michigan Court of Appeals found that Wellborn had defaulted his fair cross-section claim because he failed to raise it before the jury was sworn. *Id.* at *14. The Michigan Court of Appeals affirmed Wellborn's convictions, and the Michigan Supreme Court denied leave to appeal. *Id.* Wellborn raised a variety of claims in his habeas petition, but only appeals his fair cross-section claim. The district court found that this claim was procedurally defaulted, and held that there was no cause to excuse the default. *Id.* at *3. Because the petitioner observed the juror array, the court reasoned, he was on notice of a potential underrepresentation. *Id.* The court found that the petitioner must show evidence that the underrepresentation was intentionally concealed, a showing Wellborn did not make. *Id.* at *3-4. The court acknowledged that the Eastern District had addressed the computer glitch and excused procedural default, but found Wellborn's case distinguishable on two grounds: Wellborn was white and there was overwhelming evidence of Wellborn's guilt. *Id.* at *3–4. Wellborn filed this timely appeal.

*Ambrose II*, 684 F.3d at 640, 644.

Ultimately, the Sixth Circuit found that this Court erred in finding that petitioner did

not demonstrate cause to excuse the procedural default, stating in pertinent part:

There is no dispute that petitioners defaulted their claims by failing to object to the jury venire at trial, in violation of Michigan's contemporaneous objection rule.

- 8 -

*See, e.g., People v. Dixon*, 217 Mich. App. 400, 552 N.W.2d 663, 667 (1996). However, petitioners have shown "cause and prejudice" sufficient to excuse the default under *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The cause inquiry "ordinarily turn[s] on whether . . . some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," and is satisfied by "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). As discussed below, petitioners have shown cause because the factual basis for the claim -- the computer glitch – was not reasonably available to counsel, and petitioners could not have known that minorities were underrepresented in the jury pool by looking at the venire panel. Moreover, the Supreme Court has found cause to excuse a procedural default in a factually similar case. *See Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988).

*Id.* at 645.

However, the Sixth Circuit did not address whether petitioners met the "prejudice" prong sufficient to excuse a procedural default. Rather, that court remanded the cases to their respective trial courts for a determination of whether actual prejudice existed, instructing the courts to utilize the prejudice standard for ineffective assistance of counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

Because the district courts here did not address actual prejudice, a remand is necessary. We are then left with the question of the proper standard on remand. We are guided in part by the Eleventh Circuit's analysis of a similar question in *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir.1991). In that case, the petitioner claimed that his counsel was ineffective for failing to object to Alabama's systematic exclusion of African-American jurors from grand and petit juries. To excuse this default, the *Hollis* court required that petitioner show actual prejudice, which involved determining whether there was a reasonable probability that "a properly selected jury [would] have been less likely to convict." *Id.* at 1482. The Eleventh Circuit's analysis is persuasive. The most important aspect to the inquiry is the strength of the case against the defendant. As the Eleventh Circuit reasoned, "a transcript could show a case against [petitioner] so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Id.* at 1483 (internal quotation marks omitted). In that circumstance, actual prejudice would not be shown.

Although the instant petitions do not involve a *Strickland* claim, this standard is appropriate because it balances the competing demands of constitutionally

protected equal protection interests and comity toward the state courts. We recognize that the application of the actual prejudice standard in cases such as these presents a particularly challenging charge to the district courts below to answer the question, "what would have happened?" The law nonetheless requires that the question be answered – with a careful look at the transcripts involved, and with judgment that takes into account a fair balance of the competing interests of comity toward the final judgments of the state's criminal processes and the protection of constitutional equal protection interests.

*Ambrose II*, 684 F.3d at 652 (footnote omitted).

On remand, this Court appointed as petitioner's counsel, Attorney Bradley R. Hall of the Federal Defender Office for the Eastern District of Michigan, who was also counsel for the petitioner in the Eastern District case of *Ambrose v. Booker*. The Eastern District case proceeded as the *de facto* lead case on remand. Order (docket no. 57); *see* Order granting "Stipulation to adjourn briefing schedule in anticipation of evidentiary hearing in *Ambrose v. Booker*" (docket no. 68). This Court also appointed Attorney Hall as counsel for petitioner in *Carter v. Lafler,* 1:09-cv-215 (Order, docket no. 60). On September 16, 2013, the court held an evidentiary hearing in *Ambrose v. Booker*, in which petitioner called an expert witness, Samuel Sommers, Ph.D., who "essentially testified that a more diverse jury would have been less likely to convict Ambrose because African-American jurors are statistically less likely to convict than their Caucasian counterparts." *Ambrose v. Booker*, 24 F. Supp. 3d 626, 640 (E.D. Mich. 2014) ("*Ambrose III*"). Ultimately, the court concluded that "[b]ased on Dr. Sommers's testimony, and the fact that there is a reasonable probability that a properly selected jury in Ambrose's case would have included at least one African American, Ambrose has demonstrated actual prejudice to excuse his default so long as the evidence against him was not overwhelming." *Id.* at 653. The court went on to address the merits of the claim and found that "Ambrose has satisfied his prima facie showing of a violation

of the fair cross-section requirement; a showing that has not been rebutted by the State. His habeas petition will be granted." *Id.* at 658.

Respondent appealed and, once again, the Sixth Circuit reversed. *See Ambrose v. Booker*, 801 F.3d 567 (6th Cir. 2015) ("*Ambrose IV*"). In *Ambrose IV*, the Sixth Circuit found that the district court applied the wrong prejudice standard on remand and reiterated that the actual prejudice standard in *Strickland* applied:

> As an initial matter, the district court on remand should not have applied a less stringent *Hollis* – rather than the *Strickland* – prejudice standard to determine whether to excuse Ambrose's procedural default. The "actual prejudice" inquiry outlined in *Ambrose v. Booker*, 684 F.3d 638, 652 (2012), was intended to mirror the inquiry required by *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts must consider whether, in light of the underrepresentation of African Americans in the jury venire, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Stated another way, courts must ask, is there a reasonable probability that a different (e.g., properly selected) jury would have reached a different result, "a probability sufficient to undermine confidence in the outcome of the trial." *Id.*

*Ambrose IV*, 801 F.3d at 577-78.

Next, the Sixth Circuit stated that the district court in *Ambrose III* should not have relied on Dr. Sommers' testimony in reaching its result:

> The district court also should not have relied on Dr. Sommers' expert testimony -- in which Dr. Sommers stated that racially diverse juries are less likely to convict than all-white juries -- in making the court's "actual prejudice" determination. Dr. Sommers' testimony is not relevant to the "actual prejudice" determination because it: (1) does not support a finding that a different jury would have reached a different result; (2) lacks any individualized assessment of the case against Ambrose; and (3) relies on impermissible racial stereotypes.

*Id.* at 579 (6th Cir. 2015).

Then, the Sixth Circuit found that petitioner did not demonstrate actual prejudice, stating in pertinent part:

Ultimately, under the stricter *Strickland* standard, and without consideration of Dr. Sommers' testimony, Ambrose has failed to show actual prejudice to excuse his procedural default. Though a careful review of the record reveals some inconsistencies in the trial testimony of the two victims, and the prosecution, admittedly, failed to explain why Ambrose – after carjacking the victims at gunpoint and stealing their possessions – would later abandon the car with a cell phone, gold and silver jewelry, and a watch still inside, these issues on their own do not create a reasonable probability that a different jury would have reached a different result, a probability sufficient to undermine confidence in the outcome. "The most important aspect to the [actual prejudice] inquiry is the strength of the case against the defendant," which requires courts to take a "careful look at the transcripts involved."

*Id.* at 580. Ultimately, the Sixth Circuit concluded that "[b]ecause Ambrose failed to show actual prejudice to excuse his procedural default, his petition for writ of habeas corpus should have been denied." *Id.* at 582. Finally, petitioner sought a writ of certiorari, which the Supreme Court denied on June 13, 2016. *See Ambrose v. Romanowski*, 136 S. Ct. 2461 (2016). Based on this record, the Court will now evaluate petitioner's claim by applying the actual prejudice standard announced in *Ambrose II*, as clarified in *Ambrose IV*.

## II.    Evidence presented at trial

### A.    Prosecution's case in chief

#### 1.    AF's testimony

As discussed, petitioner was charged with criminal sexual conduct involving his two step-granddaughters, AF and CR. The evidence presented at trial also included brief testimony from a third step-granddaughter, AR, regarding alleged sexual abuse. At the time of her testimony in 2002, AF was sixteen years old and in the 10th grade. Trial Trans. II at 30-31 (docket no. 18). AF gave the following testimony. Petitioner and Mrs. Wellborn lived with her family on two separate occasions, in Virginia and in Michigan. *Id.* at 34-35. AF was five years old when she lived in Virginia. *Id.* at 35. At that time, petitioner started doing "sexual things" to her. *Id.* The first time,

petitioner ejaculated on her in the middle of the night. *Id.* at 35-36. She did not tell anyone of that incident. *Id.* at 36.

AF's family moved to Michigan and settled in Montcalm County. *Id.* at 36-37. Petitioner and Mrs. Wellborn moved in with AF's family in 1998. *Id.* at 38. Between May and September 1998, when AF was approximately 12 years old, petitioner came into her bedroom three or four times a week, kissed her using his tongue, inserted his fingers in her vagina, and placed his penis in her mouth. *Id.* at 38-40, 87. These incidents occurred at night. *Id.* Several times, AF tried to scream but petitioner covered her mouth, laid on her or hit her so she would be quiet. *Id.* at 40, 53-56. Petitioner also choked her. *Id.* at 56-57. However, she did not tell anyone of the sexual contact because petitioner threatened to harm her or her family. *Id.* at 40-41, 56. On family outings, she "didn't do many things with him alone" and always tried to have somebody with her. *Id.* at 41. Petitioner and Mrs. Wellborn eventually moved to a house in Kent County. *Id.* at 41-42.

AF visited petitioner and Mrs. Wellborn at their new house in Kent County because she missed her grandmother. *Id.* at 42. AF would spend nights at the house. *Id.* at 42. While visiting them, AF stated that

> [I]t was just the same stuff over and over again. He would use his fingers, he would put his penis in my [mouth] and he would use his tongue on my vagina. Just the same things over and over again.

*Id.* at 43. AF stated that when she went into the computer room, petitioner would kiss her, "use his fingers and put them in my vagina," and "then I tried stopping him but I couldn't." *Id.* at 43-44. He would do this while she was dressed, and then he would unbutton her clothes. *Id.* at 44. AF tried to scream, but could not. *Id.* at 43. AF played with petitioner's penis with her hands until he was ready to ejaculate, which he did in the bathroom. *Id.* at 45.

AF described the incidents as occurring "maybe every other weekend or whenever we went over there." *Id.* at 43. Although AF had both male and female cousins, petitioner "would say that how he just wanted the girls to come over, and he never wanted the boys over." *Id.* at 45. AF testified "I always tried having someone there . . . [b]ecause I didn't feel safe." *Id.* During the encounters, Mrs. Wellborn was either busy with the other children or not home. *Id.* at 43.

Petitioner also initiated phone sex with AF on two or three occasions, at which time he would ask AF what she was wearing and if she was going to come over so he could fool around with her. *Id.* at 80-81. AF stated that she would usually hang up the phone. *Id.* at 81. When asked if he put his penis in her mouth, AF stated "[t]hat would usually happen at my house" (in Montcalm County) and that "[i]t didn't really happen at his" (in Kent County). *Id.* at 43.

In 1998, when she was about 13 years old, AF told her mother (petitioner's step-daughter Lisa) that she did not feel comfortable around petitioner but did not go into any details. *Id.* at 46-47, 81-83. AF did not tell her mother about petitioner's actions because she was scared; petitioner had threatened to hurt her and her family, and she did not want anything to happen to either herself or her family. *Id.* at 47, 83-84. When her mother asked AF if she wanted to go to the police, AF answered "no." *Id.* at 47, 84-85. Before approaching her parents a second time, AF talked to her friend RS about petitioner's sexual advances. *Id.* at 48-49. RS told AF that she would go to the police if AF did not do something. *Id.* at 48. AF finally disclosed everything to her parents in March 2001, which prompted them to call the police. *Id.* at 48-49.

The police conducted investigations in Montcalm and Kent Counties. *Id.* at 49. In accordance with those investigations, AF received a physical examination. *Id.* at 49-50. While the examination did not reveal any genital warts, AF was aware that her cousin, AR, had genital warts.

- 14 -

*Id.* at 59.  This was significant because AF's mother mentioned that petitioner had genital warts in the past and that AR could have received the warts from him.  *Id.* at 59-60, 65.  AF spoke with her cousin AR regarding the sexual abuse.  *Id.* at 76-77.  AF told AR that petitioner had been touching her.  *Id.* at 77.  When AF asked AR where petitioner touched her, AR pointed to her vagina.  *Id.* at 77-78.  When AF approached another cousin, AR's sister CR, to discuss petitioner's actions, CR refused to talk about it and just started to cry.  *Id.* at 78-79.

Both AF's mother and her aunt Deana (CR and AR's mother) confided in AF that petitioner had tried sexually assaulting them when they were younger.  *Id.* at 62-65.  AF's mother also told her that petitioner raped some other girls in Virginia; however when AF later learned that petitioner did not rape anyone in Virginia, she did not ask her mother why she lied about the rapes.  *Id.* at 65-68.

### 2.     CR's testimony

CR was thirteen years old and in the seventh grade at the time of the trial.  *Id.* at 92, 94, 120.  CR gave the following testimony.  She lived with petitioner in Virginia for a few months when she was six years old.  *Id.* at 95, 121-22.  During that time, petitioner used to kiss her by putting his tongue in her mouth and on one occasion walked into a room with no underwear and "showed himself" to CR and her friend.  *Id.* at 97.  Petitioner's sexual advances in Virginia occurred less than ten times.  *Id.* at 123.  CR's family relocated to Michigan and lived with her aunt, AF's mother (Lisa).  *Id.* at 97-98.  Petitioner did not make any sexual advances toward CR during the time that CR lived with her aunt.  *Id.* at 98.  However, after petitioner moved to Kent County, he would try to French kiss CR, reached down her pants once, and touched her breasts.  *Id.* at 96, 100.  When asked if petitioner was trying to hug her, CR testified that "[m]ost people don't hug you by grabbing

- 15 -

your boobs." *Id.* at 100.  On one occasion, while CR was sitting on petitioner's lap and watching television, petitioner had his hands around her stomach and tried to reach down the front of her pajama pants. *Id.* at 100-01.  His hand went underneath her underpants but she "grabbed his hand and told him not to." *Id.* at 101.  When petitioner tried to touch her breasts in the computer room, she would say "don't" and he would leave the room.  *Id.* at 101-02. CR estimated that petitioner attempted to sexually assault her on less than ten occasions.  *Id.* at 102.  CR never reported any of the sexual advances because she was afraid that no one would believe her "[b]ecause I just thought that it's something that doesn't happen." *Id.* at 102-03.

In or about 1998 or 1999, when Lisa asked CR if petitioner sexually assaulted her, CR lied and replied "no". *Id.* at 103-04, 107-09, 111.  In 2000, when she was about eleven years old, CR finally spoke up when her cousin AF spoke up, and when she learned that petitioner had been touching her younger sister, AR.  *Id.* at 103-04, 122.  At that point in time, CR's family went to the police. *Id.* at 104 (docket no. 17).

### 3. AR's testimony

AR testified that she was nine years old and in the third grade at the time of the trial. Trial Trans. II at 125-26, 131.  AR testified that petitioner would touch her "private[s]" while in an upstairs room, and that he would touch her underneath her clothes.  *Id.* at 135-38, 140.

### 4. Lisa's testimony

Lisa (AF's mother) is petitioner's step-daughter.  *Id.* at 149-50.  Lisa gave the following testimony.  Petitioner lived with Lisa's family in Virginia for five to six months and in Montcalm County, Michigan, for almost a year. *Id.* at 151-54.  At one point in time, AF told her that she did not want to spend so much time with petitioner and did not like sitting on his lap. *Id.* at 155.

Lisa attributed the conversation to her daughter being a teenager. *Id.* at 155. At that time, petitioner mentioned that AF was being rude and ignoring him. *Id.* at 155-56, 176-77. Afterward, Lisa noticed that AF was very distant with petitioner, started to keep to herself, to have eating problems, and to experience headaches and anxiety attacks. *Id.* at 156, 160. AF also requested "100 times" that a lock be placed on her bedroom door, but Lisa and her husband refused. *Id.* at 156. When Lisa and her husband finally agreed to place a lock on AF's door, "[petitioner] had a fit and said it was a fire hazard and talked us out of it." *Id.*

After talking with a friend and counselor, AF approached her step-father, and then Lisa, to talk about petitioner's actions. *Id.* at 158-59. Upon speaking with AF, Lisa called her sister Deana, because Deana's daughter CR was also involved. *Id.* at 159. After Deana came to Lisa's house to discuss the allegations, Lisa called 911. *Id.* at 159-60.

After the present criminal case commenced, Lisa talked with AF about petitioner's sexual advances toward her when she was sixteen years old. *Id.* at 161-62. When asked if she hated petitioner, Lisa stated "[n]o, never have." *Id.* at 161. On the contrary, Lisa stated that she paid to move petitioner and her mother twice, and that she "financially supported them to have them with my family." *Id.* When describing petitioner's sexual advances toward her, Lisa stated that when petitioner tried to "touch" her, his exact words to her were "If you say anything to your mother, you know she won't believe you. She believes whatever I tell her to believe." *Id.*

Lisa also clarified that petitioner's alleged rape of a minor occurred in Michigan (rather than Virginia), and that AF must have overheard Lisa talking about it with another adult because she did not discuss it with AF. *Id.* at 162-63. The story was related to Lisa by a relative, who stated that a number of years ago, petitioner was having sex with a minor who lived either next-

- 17 -

door or a couple of houses down the street, that Mrs. Wellborn left him at the time, and that petitioner's house burned down. *Id.* at 162. On cross-examination, Lisa testified that back in 1998, she did not remember AF telling her that petitioner had threatened AF, only that AF felt uncomfortable around petitioner. *Id.* at 168-69. When Lisa approached her niece CR to see if she had any problems with petitioner, CR answered "[n]o, I don't want to talk about it." *Id.* at 170-72.

### 5.   Dr. Palusci's testimony

Dr. Vincent Palusci gave the following testimony as an expert in pediatrics. Trial Trans. III at 3, 7-8 (docket no. 19). AF had been referred to Dr. Palusci for a medical evaluation of digital and oral genital contact. *Id.* at 11. Dr. Palusci performed the medical evaluation, including a genital examination, on March 22, 2001. *Id.* at 10, 15. The doctor did not find any injuries, cuts, or bruises, and the laboratory results did not reveal any sexually transmitted diseases. *Id.* at 13-16. Dr. Palusci also examined CR for digital genital contact but did not find any injuries. *Id.* at 17, 19. He did not obtain a separate laboratory specimen for sexually transmitted diseases because CR recently underwent tests related to menstrual irregularities. *Id.* at 19-20. Finally, Dr. Palusci examined AR (the youngest of the three step-granddaughters) for digital genital contact on April 5, 2001. *Id.* at 20-22. He found genital warts near AR's urethra. *Id.* at 22. The doctor testified that genital warts can be sexually transmitted, and that to be transmitted, the wart tissue has to be directly transferred to the infected area by contact. *Id.* at 22, 32, 47. However, the doctor did not know the source of the contact. *Id.* at 32-33. In explaining his findings, Dr. Palusci testified that it is not typical to find scarring or substantial injuries from digital or oral genital contact especially when there has been a significant delay in time. *Id.* at 24, 47-48. Finally, Dr. Palusci referred all three of petitioner's step-granddaughters to counseling. *Id.* at 17, 20, 23-24.

6.      **Deana's testimony**

Deana is petitioner's step-daughter and the mother of CR and AR. *Id.* at 48-49. She gave the following testimony. Deana's family lived with petitioner in Virginia. *Id.* at 50. When Deana's family returned to Michigan, they initially lived with her sister Lisa. *Id.* at 51. In March 2001, Lisa called Deana at work and asked her to come home. *Id.* at 53-54. When she arrived, Deana asked CR if petitioner ever touched her. *Id.* at 54-56. CR became very upset and cried. *Id.* at 56. Shortly thereafter, Lisa came to Deana's home to discuss petitioner's alleged sexual abuse of the step-granddaughters, at which time they called the police. *Id.* at 56-57. Deana also testified that CR would not go to petitioner's house alone, that CR became depressed and quiet, and that CR complained of stomach problems. *Id.* at 57-58.

7.      **RS's testimony**

RS was a schoolmate of AF. RS was eighteen years old at the time of trial. RS testified that she played volleyball with AF at the high school. *Id.* at 95-96. RS was a few years older than AF. Around January 2001, after RS had driven AF and others to participate in a volleyball fund raiser, she chatted with AF on hotmail messenger. *Id.* at 95-98. During the messaging, which lasted about an hour, AF stated that petitioner had sexually abused her. *Id.* at 98, 102-103, 106. Upon receiving that information, RS told AF that she had to speak with her parents about it first and that she (RS) was going to tell the police. *Id.* at 103. RS gave AF one week to have the talk. *Id.* at 103. When AF did not approach her parents during that time, RS met with the school counselor and the police were called. *Id.* at 103-04. AF also gave RS a handwritten letter. *Id.* at 108-110. The letter talked about many incidents of petitioner molesting AF, such as "masturbating in front of her, him going inside her, making her give him oral sex, him fondling her, feeling her

pretty much up [sic]." *Id.* at 110-11.  RS had the letter for two days, but gave it back to AF because she (AF) had to give the letter to Child Protective Services.  *Id.* at 108-10.

### 8.    Detective Kik's testimony

Detective Diane Kik testified that she works in the Kent County Sheriff's Department. *Id.* at 113-14.  On March 8, 2001, Detective Kik met with Lisa and Deana, and later individually with AF, CR and AR.  *Id.* at 115-16.  During her interview, AR did not indicate any problems with petitioner.  *Id.* at 116.  On cross-examination, petitioner's counsel addressed various discrepancies in the police report prepared by Detective Kik: that the first person AF told about the sexual abuse was not RS; that there was no statement made that "[petitioner] put his penis inside her vagina"; and, that the detective did not ask AF, and AF did not volunteer, a statement that "[petitioner] had grabbed my boobs."  *Id.* at 123-27.

### 9.    Mr. Cottrell's testimony

Tom Cottrell, the Program Director of the Child Sexual Abuse Treatment Program at the YWCA, gave the following testimony as an expert in the field of "exposure to sexual assault." Trial Trans. IV at 3-4, 7 (docket no. 20).  The program provides counseling to families of sexual abuse.  *Id.* at 4.  Eighty percent of the cases of sexual abuse in a family do not result in immediate disclosure, with disclosure generally occurring anywhere between a matter of weeks to 30 to 40 years.  *Id.* at 10.   A sexual abuse victim may not want to disclose due to fear, loyalties to the offender, or loyalties to other family members.  *Id.* at 10-11.  Disclosure may occur when a victim finds that a sibling was also abused.  *Id.* at 15. Mr. Cottrell further stated that any child who is being sexually abused is confused about what is happening to them.  *Id.* at 29.

**B.     Defense case in chief**

**1.     Petitioner's testimony**

Petitioner gave the following testimony in his defense. *Id.* at 31.  Petitioner is married to Mrs. Wellborn, has two step-daughters, Lisa and Deana, and three step-granddaughters, AF, CR and AR.  *Id.* at 32-33.  He is six feet, five inches tall, and his weight fluctuated between 340 pounds and 455 pounds.  *Id.* at 32.  He denied sexually assaulting Lisa, AF, CR and AR.  *Id.* at 35-37, 53. Petitioner and Mrs. Wellborn "did everything" with the grandchildren and he was horrified by the allegations made against him.  *Id.* at 34-36.  He claimed that the allegations of sexual assault are the result of Mrs. Wellborn's ex-husband, Mr. Faunce, attempting to re-enter their lives after fifteen years.  *Id.* at 37-38; *see also id.* at 108-109.  Petitioner testified that Mr. Faunce "was gone for 15 years because of problems with the law enforcement community, reappeared, was asked to come back into the family, and my wife and I did not agree that -- I don't want to get into a whole other story here -- my wife and I did not agree that we could comfortably go to holidays and everything with this individual present."  *Id.* at 38.

Petitioner also testified that he never raped a girl in Virginia or had his house burned down as a form of revenge.  *Id.* at 37, 40-41.  In 1998, Lisa and Deana did not approach petitioner to say that either AF or CR were uncomfortable around him.  *Id.* at 51-52.  Later, in 2000, petitioner and Mrs. Wellborn refused to spend the holidays with her daughters if Mr. Faunce was present.  *Id.* at 38-39. This upset Lisa, whom petitioner described as a "control freak" who "controls the family." *Id.* at 38.  Before Christmas 2000, Lisa and Deana also approached petitioner's wife about leaving him because petitioner abused her for 17 years (by not allowing her to have friends, a car, or a job).

*Id.* at 39.  Petitioner also claimed that Mrs. Wellborn filed a false police report against him.  *Id.* at 39-40.

On cross-examination, petitioner testified that the assistant prosecutor, Attorney Becker, persuaded AF to lie.  *Id.* at 57.  When Attorney Becker asked petitioner how he persuaded AF to lie, petitioner accused the prosecutor of "trying to double-talk" him. *Id.* at 58.  Then, petitioner stated that he was not accusing Attorney Becker of manipulating the victims, but rather he was accusing his step-daughter Lisa of manipulating the victims.  *Id.* at 58-59.  Petitioner also testified about a conspiracy against him, which included law enforcement and family members.  *Id.* at 61.  Specifically, Lisa manipulated people by "[t]hreats, screaming like a banshee, conning people, stealing, lying, bad checks [sic]."  *Id.* at 61.  Petitioner accused the detective (Kik) of covering up Lisa's past record of illegal behavior.  *Id.* at 62.  Petitioner also accused Lisa of  manipulating him on other occasions, e.g., having him lie to prospective employers about her job qualifications.  *Id.* at 66.  In summary, according to petitioner, all of the allegations against him were "a bunch of lies" and that his step-daughters, the detective and the prosecutor were "trying to get me."  *Id.* at 59-60.

**2.      Mrs. Wellborn's testimony**

Mrs. Wellborn gave the following testimony for the defense.  *Id.* at 72-73.  She described her daughter Lisa as controlling.  *Id.* at 84.  Mrs. Wellborn never saw petitioner discipline AF, CR or AR, and did not notice any bruises or scrapes on the three children when they spent the night at her house.  *Id.* at 75, 81-82.  She never heard any screams in the middle of the night or any cries for help from any of her granddaughters.  *Id.* at 81.  Neither AF, CR nor AR indicated to her that they were scared of petitioner.  *Id.* at 82.

- 22 -

At some point in time, Mrs. Wellborn went to talk to AF and CR at their school. *Id.*
at 86-88.  When Mrs. Wellborn asked AF about what was going on with petitioner, AF told her that
Lisa told AF that petitioner raped a girl in Virginia, and that AF did not want that to happen to her,
CR or AR. *Id.* at 86-87.  According to Mrs. Wellborn, AF "was acting like it was a game, not
serious" and AF also told her that according to the detectives, petitioner could get the help he needed
if he stays in jail. *Id.* at 86-87.  During the conversation, Mrs. Wellborn did not argue with AF or
"belittle" her. *Id.*  Then, Mrs. Wellborn and AF met CR in the hallway and went into the office.
When Mrs. Wellborn asked CR what was going on with petitioner, CR screamed that she wanted
it to end. *Id.* at 88-89.  At that time, school officials ended the conversation. *Id.* at 89.  On cross-
examination, Mrs. Wellborn denied that she accused AF and CR of lying. *Id.* at 93.  Mrs. Wellborn
also stated that she has chosen petitioner's side of the controversy and does not see her daughters or
granddaughters any more. *Id.*

### C.     Prosecution's rebuttal

On rebuttal, AF testified that Mrs. Wellborn pulled AF out of class, accused her of
fabricating the sexual abuse charges, and called her a slut, a whore, and a bitch. *Id.* at 96-97, 100.
Mrs. Wellborn also pulled CR from her class. *Id.* at 98.  CR started crying and saying that Mrs.
Wellborn could not tell her that it never happened. *Id.*  AF and CR were both crying. *Id.* at 98.  The
school counselor tried to escort Mrs. Wellborn out of the building, but she fought back. *Id.* at 98-99.
Eventually, the counselor got some help and Mrs. Wellborn was removed from the school. *Id.*

CR testified that she talked to Mrs. Wellborn and AF in the high school counseling
office. *Id.* at 105.  During the conversation, Mrs. Wellborn said that this never happened, that they
(AF and CR) were lying about it, and that they were "big liars" and "little bitches". *Id.* at 105-108.

- 23 -

Mr. Faunce's current wife, Erma Faunce, gave brief testimony, apparently to rebut petitioner's statements regarding Mr. Faunce's "problems with the law enforcement community" and Faunce's attempt to re-enter his biological family's lives after a 15 year absence. Mrs. Faunce testified that she and her husband have been married for 17 years and moved to Michigan in April 2000. *Id.* at 109. Prior to that time, they were missionaries residing in Florida. *Id.*

Finally, Detective Kik testified regarding an interview with petitioner on May 27, 2001, where she told petitioner about the sexual abuse allegations. *Id.* at 111-13. Petitioner stated that the allegations of AF and CR were not true. *Id.* at 113. Petitioner denied touching the girls but mentioned that he could have touched them by accident. *Id.* at 114, 118. While petitioner mentioned that Lisa was controlling and angry with him, he did not say anything about Mr. Faunce being involved. *Id.* at 114-15. When asked why AF would make this up, petitioner blamed the allegations on Lisa's controlling behavior. *Id.* at 120.

### III.    Discussion

To determine whether petitioner demonstrated actual prejudice sufficient to excuse the procedural default, "courts must ask, is there a reasonable probability that a different (e.g., properly selected) jury would have reached a different result, a probability sufficient to undermine confidence in the outcome of the trial." *Ambrose IV*, 801 F.3d at 578 (internal quotation marks omitted). "The most important aspect to the actual prejudice inquiry is the strength of the case against the defendant, which requires courts to take a careful look at the transcripts involved." *Id.* at 580 (internal quotation marks and brackets omitted). Actual prejudice does not exist where the trial transcript showed that the prosecution's case against the petitioner was so strong, and the

defense was so weak, "that a court would consider it highly improbable that an unbiased jury could acquit."  *Id.* at 575, quoting *Ambrose II*, 684 F.3d at 652.

After reviewing the trial transcript in detail, the Court concludes that petitioner has failed to demonstrate actual prejudice necessary to excuse his procedural default.  The prosecution's case against petitioner was strong.  The Court summarized that evidence when it addressed the merits of petitioner's ineffective assistance of counsel claims:

> [T]he prosecution introduced overwhelming evidence of Petitioner's guilt.  [AF], [CF] and [AR] testified regarding several instances of sexual assault by Petitioner in Kent County.  [AF] testified that Petitioner put his fingers in her vagina and his tongue in her vagina on several occasions.  (Tr. II, 42-44.)  Most of the sexual encounters occurred in the computer room of Petitioner's residence. (Tr. II, 43.)  The first encounter [AF] remembered in the computer room was when Petitioner kissed her and put his fingers in her vagina. (Tr. II, 44.)  At Petitioner's request, [AF] also used her hands to play with his penis.  (Tr. II, 45.)
>
> [CR] testified that Petitioner would try to French kiss her, reach down her pants and touch her breasts.  (Tr. II, 96, 100-02.)  Petitioner, however, only tried to reach down her pants once. (Tr. II, 101-02.) [CR] told him no and stopped his hand. (Tr. II, 101.)  While [CR] was in the computer room, Petitioner would also try to touch her breasts. (Tr. II, 102.) [CR] estimated that Petitioner attempted to sexually assault her on less than ten occasions.  (Tr. II, 102.)

R&R (Feb. 27, 2009) at PageID.285.

In contrast, the defense evidence was weak.  "[T]o successfully argue that it is reasonably probable that a different jury would have accepted the defense theory, and thus have reached a different result, a defendant must show that there is some support for that theory." *Ambrose IV*, 801 F.3d at 581.  Here, petitioner testified that he did not sexually abuse any of the step-granddaughters.  Petitioner's theory is that the victims were manipulated into giving false testimony because: Mr. Faunce was attempting to re-enter their lives after a 15-year absence; the victims were being controlled by his step-daughter Lisa; and there was some type of conspiracy

- 25 -

among his step-daughters, the detective and the prosecutor to "get him."  However, petitioner

presented no evidence with respect to the victims' specific allegations made against him, to support

his theory that the victims were being manipulated to lie about the numerous instances of sexual

abuse, or to establish a conspiracy between his step-daughters, the detective and the prosecutor or

to explain how they manipulated the victims' testimony.

Finally, petitioner contends that a different jury would have reached a different result

for two additional reasons.  First, petitioner contends that the jury was deadlocked on one of the

counts and that "[a] different jury easily could have resolved the deadlock differently."  Petitioner's

Brief (docket no. 69, PageID.454).  Petitioner's cursory argument does not address how the alleged

deadlocked jury meets the actual prejudice test articulated by the Sixth Circuit in *Ambrose II* or

*Ambrose IV*.   Furthermore, the argument is not persuasive.  While petitioner refers to the jury as

"deadlocked," there is no evidence that jury was deadlocked, e.g., that a mistrial was imminent or

that the trial judge found it necessary to give the jury a coercive instruction to break a deadlock.  *See*

*generally*, *People v. Sullivan*, 392 Mich. 324, 334, 220 N.W.2d 441 (1974) (cautioning that an

instruction given by the trial judge which "can cause a juror to abandon his conscientious dissent and

defer to the majority solely for the sake of reaching agreement" should not be used).  Here, the record

reflects that during their deliberations, the jury asked the trial court whether they could have a

verdict on one or two counts and be undecided on one.  Trial Trans. VI at 3 (docket no. 21).  The

Court advised the jury that they could enter such a verdict if they were genuinely satisfied that further

efforts would not result in a "reasonable likelihood of resolving the count on which your are

undecided."  *Id.*  However, if the jury felt that more work could get a resolution of the undecided

matter, then the preference is to "continue to work to resolve everything."  *Id.*   The trial judge

- 26 -

further told the jury that if they did not believe that there was a reasonable prospect of resolving what was undecided, "tell me that and tell me what matters you have decided, and that's an acceptable resolution of this case at this time." *Id.* at 3-4. The record reflects that the jury deliberated and entered a verdict later that afternoon on all three counts. *Id.* at 5-6. The fact that the jury posed a question to the judge during their deliberation does not establish that a different jury would have decided the case differently.

Second, petitioner contends that a jury in a different county acquitted him of "the very same conduct that represents two of the three charges in this case, in a trial that featured most of the same witnesses." Petitioner's Brief at PageID.454) (emphasis omitted). Based on his sparse submissions, it appears that petitioner is referring to a trial held in Montcalm County, Michigan, *People v. Carl Wellborn*, 1:H-192-FH, in which he was found not guilty. *See* Excerpt of Jury Trial (list of witnesses) (docket no. 73); Trial Trans. (jury verdict) (docket no. 74).[4] Once again, petitioner's cursory argument does not address the actual prejudice test articulated by the Sixth Circuit in *Ambrose II* or *Ambrose IV*. The fact that a jury found petitioner not guilty of committing certain crimes in Montcalm County is irrelevant to whether a different jury in the present case would have found petitioner not guilty of committing separate and distinct crimes in Kent County.

While there were some inconsistencies in the victims' testimony, their accounts of the sexual abuse, coupled with the testimony of the other prosecution witnesses, provided strong evidence against petitioner. In contrast, the defense evidence, which boiled down to petitioner's testimony that his step-daughters, a detective, a prosecutor and Mr. Faunce manipulated the victims

---

[4] The Court notes that while the jury found petitioner not guilty on five counts of criminal conduct, it does not identify the crimes charged. Trial Trans. (docket no. 74).

to falsely accuse him of sexual abuse, is weak.  Given this evidence, it is not reasonably probable that a different jury would have reached a different result.  *See Ambrose IV*, 801 F.3d at 578, 581. Petitioner has failed to demonstrate actual prejudice sufficient to excuse the procedural default. Accordingly, the petition should be denied.

## IV.   Recommendation

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  December 2, 2016                          /s/ Ray Kent
                                                  RAY KENT
                                                  United States Magistrate Judge

ANY OBJECTIONS to this Amended Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).